# SUMWALT ICE AND COAL COMPANY *vs.* KNICK-ERBOCKER ICE COMPANY.

*Waiver of Right—Instruction to Jury Concerning—Failure of Seller to Deliver Part of Goods as Demanded—Waiver of Right to Rescind Contract Not Waiver of Claim for Damages—Authority of Agent to Cancel Contract—Evidence.*

In determining whether there has been a waiver or not it generally happens that there are facts which must be submitted to the jury, but the Court should instruct them as to the legal effect of their finding such facts.

When the question of waiver *vel non* depends upon the evidence in the case, it is error to leave to the jury the broad question whether there was a waiver, without any indication of the particular facts they must find in order to infer a waiver.

When a contract requires the seller to deliver goods as demanded during a certain period of time, and he fails or refuses to make a delivery as requested, thus giving to the buyer the right to rescind the contract, then, if the buyer afterwards demands and receives other goods, he may be held to have waived his right to rescind the contract. But by thus waiving his right to rescind, the buyer does not waive his right to claim damages for the breach by the seller's failure to make the prior delivery as demanded.

Thus, where a buyer was entitled to demand 600 tons of ice each week during a certain period, and the seller refused or was unable to deliver more than 300 tons, the buyer, merely by accepting the 300 tons, does not waive his right to the stipulated amount, and is not prevented from afterwards recovering damages for the failure of the seller to deliver that amount.

The defendant, an ice company, agreed to sell and deliver to the plaintiff such quantities of ice as the plaintiff might require during two years at designated prices. The plaintiff

agreed to take not less than 6,000 tons in the first year, but it was stipulated that the defendant should not be required to deliver more than 12,000 tons in each year, or more than 600 tons in each week. Before the expiration of the time limited for the duration of the contract, the plaintiff brought this action to recover damages, alleging that the defendant had failed to deliver the stipulated number of tons, although the plaintiff had demanded the same at certain times. After the institution of the action, the plaintiff continued to take ice from the defendant under the contract. *Held,* that it was necessary for the plaintiff, under the terms of this agreement, to make demand or give notice to the defendant of the quantity of ice required each week.

*Held,* further, that an instruction is erroneous which declares that if the plaintiff made a demand for ice as required, but that afterwards, either upon the request of the defendant or upon its protest that the furnishing of such ice was not within the terms of the contract, the said demand was waived, then the same may be treated as never having been made. This instruction fails to state what was necessary to constitute a waiver or what agent of the plaintiff was authorized to waive the demand.

*Held,* further, that a mere request by the defendant that the plaintiff should sell as little ice as possible consistent with his engagements, was not a refusal by the defendant to furnish ice under the terms of the contract, and did not relieve the plaintiff from the necessity of making a demand for the quantity of ice required.

The fact that an officer of a corporation had the power to make a contract for it does not prove that he had the power to cancel a contract after it is made.

*Decided February 4th, 1910.*

Appeal from the Superior Court of Baltimore City (NILES, J.).

*Plaintiff's 3rd Prayer.*—That under the evidence in this case the plaintiff was entitled to demand ice from the defend-

ant in amounts up to 600 tons in any or each and every of the weeks within the said contract during the first year thereof, until 12,000 tons had been delivered, and that if it finds from the evidence that at a time when the plaintiff was entitled to the ice under the contract in evidence in this case, if it shall so find, the defendant advised the plaintiff that it could have no ice except for the regular trade enjoyed by it prior to the condition existing as a result of the ice shortage of that year, if it should so find or advised the plaintiff to take no new trade but to let off all the trade that it possibly could, otherwise the said defendant would not have sufficient ice to supply the needs of the plaintiff, that then the plaintiff was thereby absolved from the necessity of specifically demanding of the defendant ice for any purpose other than for its said regular trade so existing independent of the said conditions resulting from the said ice shortage, if it should so find, and that any neglect on the part of the plaintiff to make demand in excess thereof shall in no wise bar or preclude the plaintiff in this suit. (*Refused.*)

*Defendant's 7th Prayer.*—That it was perfectly legitimate under the terms of the contract sued on for the defendant to request and urge the plaintiff, its servants and agents, to sell as little ice as consistent with their engagement and not to take on any new trade, provided that the Court so sitting shall find that such request and urging was not in reality a refusal to furnish ice under the terms of the contract, but a mere expression of desire on the part of defendant. (*Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*William S. Bryan, Jr.,* and *E. Allan Sauerwein, Jr.,* for the appellant.

*Edward C. Carrington, Jr.,* (with whom was *Campbell Carrington* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant sued the appellee for an alleged breach of contract to furnish it ice.   There was a written contract between the parties which contains, among other provisions, the following: "That the said party of the first part (the appellee) will sell to the said party of the second part (the appellant) and the said party of the second part agrees to purchase of the said party of the first part, such quantities of ice, as the said party of the second part may require in its business from the first day of April, 1906, to the first day of April, 1908, at the following platform prices."   The prices per ton, varying from $1.75 to $2.25, are then set out from April, 1906, to March, 1907, inclusive, and $2.25 is the price named from April 1st, 1907, to October 1st, 1907, and $1.75 from October 1st, 1907, to April 1st, 1908, and it is then stated: "All bills for same to be payable at the end of each week."

By the contract the appellant agreed to take as a minimum amount six thousand tons during each and every year of the contract, and to pay fifty cents for each ton short of that minimum quantity, and it was agreed that the appellee was to incur no liability for a failure to deliver during the first year a greater quantity than twelve thousand tons, or in any week during the first year more than six hundred tons, and for the second year the quantities named were fifteen thousand tons for the year, and seven hundred and fifty tons per week.   The appellant agreed not to sell to certain companies named in the contract and each party agreed not to sell to the customers of the other party.

This suit was instituted on November 7, 1907, but the appellant continued to purchase ice throughout the period named in the contract—from April 1st, 1906, to March 31st, 1908. At no time were six hundred tons furnished the appellant in a week, and during the first year something less than ten thousand tons and during second year about nine thousand five hundred and forty-eight tons were received, according to the statement filed by the appellant.   The case was tried be-

fore the Court, without the aid of a jury, and, a verdict hav-ing been rendered in favor of the defendant, this appeal was taken from the judgment entered thereon.   During the trial four exceptions were taken—the first three being to the re-fusal of the Court to permit certain questions to be answered, and the fourth to the rulings on the prayers.   The plaintiff excepted to the action of the Court in granting the defend-ant's third, fourth and seventh prayers, in refusing the plain-tiff's third and in granting its own instruction in lieu there-of, and in overruling the plaintiff's special exception to the Court's own instruction.

As the appellant complains especially of the Court's own instruction, we will first consider that.   It was as follows: "If the Court sitting as a jury shall find from the evidence that the plaintiff made demand upon the defendant for ice required by the plaintiff in its business, under the circum-stances set out in the plaintiff's second prayer as giving the plaintiff the right to make such demand, and if the Court so sitting shall further find that in making such demand the plaintiff stated the particular purpose or purposes for which said ice was desired.   And if the Court so sitting shall further find that the defendant refused to furnish the ice so de-manded, and also refused to furnish any ice to plaintiff for the purpose or purposes so specified.   And if the Court so sitting shall find that said last mentioned refusal was such that plaintiff might reasonably consider it deliberate and final, then such refusal excused the plaintiff from making any other demand for ice for such purpose or purposes; and the Court sitting as aforesaid may allow plaintiff damages, according to the rule set out in the plaintiff's fourth prayer, on account of such ice as it may find from the evidence that plaintiff required for such purposes, (it) would have de-manded had it not been for such refusal.   If, however, the Court, so sitting, shall find that a demand or request for ice required as aforesaid was made, but shall further find from all the facts and circumstances of the case that afterward, either upon request of the defendant or upon its *bona fide*

protest that the furnishing of such ice was not within the terms of the contract, the said demand of the plaintiff was waived, then the Coort, so sitting, may treat such demand as never having been made."

There can be no doubt that there was evidence tending to prove that the plaintiff did not get all the ice it wanted during the months of June, July, August and September, 1906, and that it was demanding more. Mr. Hammond, the president of the plaintiff, testified that Mr. Kirkpatrick, the vice-president and general manager of the defendant, notified him about the first or second of June, that they must not take on any new trade and must let off all the old trade possible, that he would not deliver ice for new trade, as there would not be ice enough for them. He said similar notices were frequently received from Mr. Kirkpatrick, and offered in evidence a letter from him dated June 11, 1906, in which he spoke of the supply of the ice being short, that his company had not taken on any new trade, and said: "Our contract with you stipulates that you shall not interfere with our business in any way, and at the time this contract was made it was understood that when the shortage in the market did arise this season you would not sell ice in wholesale quantities to any trade that we might serve if we cared to take it on, but that you would confine yourself strictly to your business as retail ice dealers." The next day Mr. Hammond replied: "We deny most emphatically the existence of any verbal agreement or understanding, either past or present, concerning our supply or sale of ice, and respectfully refer you to our written contract. The only possible help or encouragement that you can contribute to the Sumwalt Ice and Coal Company is the carrying out of this contract. In conclusion let me say that the Sumwalt Ice and Coal Company are not disposed to surrender any of their rights under this written contract with the Knickerbocker Ice Co." He testified that: "The plaintiff continued hauling ice from the defendant's platform, receiving short supply all the time, yet demanding full supply, as its drivers were daily complaining that they

had not enough ice for the trade." He said they made demand for ice to fill carload orders, and with the exception of eight tons for Pen Mar and eleven to McCall's Ferry "we were refused most positively, and in some cases, insultingly." He also said they had received on the 29th of June an order from the Gardiner Dairy Company for twenty tons a day for the month of July or longer, at $5.00 a ton; that they started to deliver it the next morning, when the defendant informed them that they could have no ice for that company and that if they did not stop delivering to it their entire supply would be cut off; "that there was not one day during that season that his wagons got within many tons all the ice they needed for their trade." On August 1st, he wrote complaining of inconvenience to which they were being subjected by being compelled to send their wagons from four to six blocks out of the way, to get inferior natural ice, and of the delays caused by not having enough men on board the vessels and in the house to properly deliver ice to them, and concluded by saying: "You must also know that your refusal and failure to deliver ice to us in such quantities within the maximum of our contract of March 19th, 1906, as we have had occasion to order of you is causing us pecuniary loss, for which we have a right to expect an accounting of you." There is other evidence tending to show that the plaintiff was demanding ice according to the contract, and that it was not receiving what it was entitled to have.

This case is somewhat peculiar in that the contract did not require the appellant to take any definite quantity of ice every week, but it was only required to take six thousand tons each year, but, although the appellee was required to deliver twelve thousand tons a year, not more than six hundred tons in any one week, it was necessary for the appellant to make some demand or give notice to the appellee of the quantity it wanted, for the reason that the appellant could have averaged only about one hundred and fifteen tons a week and have complied with its part of the contract, but it had the right to demand six hundred tons. In other words there

was no default on the part of the appellee merely because it did not deliver six hundred tons in a week, but there must have been some demand for it by the appellant. There is also evidence on the part of the appellee tending to show that it did furnish all the ice that was demanded of it, excepting some which the appellee contended it was not bound to furnish under the contract. We suppose this instruction refers particularly to carload lots and to that to be furnished to the Gardiner Dairy Company, both of which the appellee contended it was not bound under the contract to furnish.

The principal defect in this instruction was leaving to the Court, sitting as a jury, to determine whether the demand was waived without stating what was necessary to constitute a waiver, or who could waive it. It is true the case was tried before the Court, but the instruction was to it as a jury, and it is impossible to tell from it what the Court regarded as sufficient in law to be a waiver, or what agents of the appellant it thought could waive. In determining whether there has been a waiver, it generally happens that there are facts which must be submitted to the jury, but the Court instructs the jury as to the legal effect of their finding of such facts. In *Pentz* v. *Penn. Fire Ins. Co.,* 92 Md. 444, the instruction as modified concluded: "and shall further find that there was no waiver of the proofs of loss as required by the policy." In passing on that instruction JUDGE SCHMUCKER said: "The portion which we have quoted of this modification was erroneous, as it was unaccompanied by any instruction as to what acts or conduct of the defendant or its agent, of which there was evidence in the case, were sufficient to constitute the waiver. When, as in the present case, the alleged waiver is to be inferred from facts and circumstances resting entirely on parol evidence, the question of waiver *vel non* is one for the jury under instructions from the Court indicating to them the portions of the evidence from which they may infer the waiver, but it is erroneous in such cases to leave to the jury the broad question whether there was a waiver without any indication of what facts they must find from the evidence

in order to infer the waiver. *Traub's Case* on the first appeal, in 80 Md. 224." See also *Walter* v. *Bloede Co.,* 94 Md. 90; *Spring Garden Mut. Ins. Co.* v. *Evans,* 9 Md. 1.

This case illustrates the importance of that rule. Upon a material failure of the appellee to comply with the contract, the appellant had the right to rescind it, but it was not compelled to do so, and it could be held to waive that right by subsequently affirming the contract, by continuing to deal under it. But waiving the right to rescind a contract is a very different thing from waiving a right to hold the other party responsible in damages for a partial failure to comply with it. Merely continuing to purchase ice was not necessarily such a waiver. The testimony shows that the appellant could not get the additional ice it wanted elsewhere, and if it had disaffirmed the contract, and refused to take any ice from the appellee, it might have been seriously embarrassed or even ruined, as it could not have complied with its contracts to furnish its customers. When one party agrees to furnish six hundred tons of ice a week, and it cannot, or will not, furnish more than three hundred tons a week, and the difference cannot be obtained elsewhere, the vendee should not be required either to take the three hundred or none. On the contrary, its refusal to take the three hundred might add unnecessary loss to the vendor. The price for ice during the months of June, July, August and September, 1906, under this contract, was $2.25 per ton, while the evidence shows that it was selling at from $4.00 to $10.00 per ton and that the appellee sold some at $8.00 and $10.00 per ton, and it was difficult to get at any price. As we have said, the appellant could have rescinded the contract (assuming, of course, its evidence to be true) but it was not compelled to do so. Yet a jury might have supposed that the mere continuance to take under this contract was a waiver of its right to require the full amount called for by the contract to be furnished.

The appellee has cited such cases as *Bollman* v. *Burt,* 61 Md. 415, *Md. Fer. Co.* v. *Lorentz,* 44 Md. 218, and *McGrath* v. *Gegner,* 77 Md. 340, to sustain the contention that accept-

ance by the plaintiff of ice to the time of the expiration of the contract condoned or waived the breaches which had previously occurred, but in each of those cases the question was whether the contract had been rescinded, and neither of them included such a question as is in this case. Of course, if a party has the right to rescind a contract by reason of a breach by the other party, and then condones or waives the breach, he cannot in a suit against him for a subsequent breach set up the former one, but whether a party can furnish one-half or less of what he agreed to furnish and then claim that he is not liable for damages because the other party accepted the half, although circumstances compelled him to do so, is an altogether different question. If that be so in all cases, then under such circumstances as we have in this case a party can profit by his own wrong, as this record shows such conditions in the ice trade as to make it certain that the appellant was compelled to accept all the ice it could get, or to face possible disaster or ruin.

The character of this contract and the circumstances surrounding its execution show that it could not have been the intention of the parties that the appellant should on default of the appellee be required to either entirely rescind the contract and take no more ice, or to accept what the appellant chose to or could deliver to it without holding the appellee liable in damages. It was known by both parties that there was likely to be a scarcity of ice. Much more of it is used during the summer months than at other times of the year. It is more valuable then, as the prices in this contract show, and the failure to get it then is of more serious consequence than a delay in delivering ordinary articles of merchandise. If a large and strong company could place a smaller and weaker one in the position of either accepting what the former chose to deliver the latter, regardless of the contract, or of rescinding the contract, and relying entirely on a recovery of damages, but little protection would be furnished by the law to those not in a financial condition to await the results of litigation. We do not mean to speak of the appellant

as a financially weak company, but only intend to illustrate the point by what we have said. Of course, we do not say that the appellant could not have waived its right to have the full amount of ice provided for in the contract, but we do hold that merely continuing to accept a less quantity was not such a waiver.

The appellee referred in a supplemental brief to the case of *Wolfert* v. *Caledonia Springs Ice Co.,* 195 N. Y. 118, S. C. 88 N. E. Rep. 24, but recovery in that case was based on a rescission of the contract. The Court said: "The recovery in this action is not for some special and incidental damage to the plaintiff, but it is based on a rescission of the entire contract." It did not involve the question now under consideration, and we need not determine whether the New York decision in reference to sales of goods to be delivered in installments can be reconciled with our own. Whether or not another suit can be instituted for breaches which occurred after this suit was brought is not before us, and whether this appellant waived its right to rescind this contract by continuing to accept ice is not involved, as it does not claim to have rescinded the contract, but relies on it. So without discussing other reasons, we are of the opinion that for the one given above there was error in giving the Court's own instruction.

The plaintiff's third prayer was properly rejected. Without discussing it at length, it was objectionable for the reason that it asked the Court to say that if the Court sitting as a jury found that the defendant "advised the plaintiff to take on no new trade, but to let off all the trade that it possibly could, otherwise the said defendant would not have sufficient ice to supply the needs of the plaintiff, that then the plaintiff was thereby absolved from the necessity of specifically demanding of the defendant ice for any purpose other than for its regular trade," etc. The seventh prayer of the defendant, granted by the Court, properly submitted that question. Merely advising the plaintiff as stated in the prayer is not sufficient to relieve it of the necessity of asking for more ice

than it was receiving, if it wanted more. We do not understand the exceptions to the third and fourth prayers of the defendant to be pressed.

There was no error in rejecting the evidence, as offered, which is set out in the first, second and third bills of exception. It is true that Mr. Kirkpatrick was vice-president and general manager of the company and that he signed the contract, but there was no proffer to show that he was authorized to cancel it, or to make an offer for its cancellation. An agent may have authority to make a contract for his principal, but it does not follow that he has power to cancel it, and especially to pay a large sum of money to obtain its cancellation. The record shows that Mr. McKinnon, the president of the defendant, was having some supervision over this contract, and there is nothing to show that he or the company ever vested Mr. Kirpatrick with such power over the contract as to bind the company by such offers as were proposed to be shown by this evidence. But beyond that, we think that at the time the proffer of the testimony was made the evidence was not relevant, even if it became so afterwards. No witnesses had been produced by the defendant, hence such evidence could not reflect upon the question as to whether those of the plaintiff or those of the defendant were correct in their statements, as suggested by the counsel for the appellant. It is a dangerous character of testimony at best, and the Court was right in rejecting it.

For error in the instruction given by the Court, we must reverse the judgment.

*Judgment reversed, and new trial awarded, the appellee to pay the costs.*