SHRIVER OIL COMPANY *v.* INTEROCEAN
OIL COMPANY.

[No. 68, January Term, 1929.]

342

*Decided May 23rd, 1929.*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Charles C. Wallace* and *Edward H. Hammond,* with whom were *Wallace & Hammond* on the brief, for the appellant.

*J. Cookman Boyd,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the plaintiff (appellee) against the defendant (appellant). There are eight exceptions in the record, the first seven to rulings on the evidence and one, the eighth, to the granting of the plaintiff's (appellee's) first prayer, the overruling of the defendant's (appellant's) exceptions to the granting of the plaintiff's first prayer, and the refusal of the defendant's first and third prayers.

On December 20th, 1923, an agreement was entered into between the Interocean Oil Company, appellee, and the Shriver Oil Company, appellant, whereby the former agreed to sell to the latter for the period of ten years the appellant's entire requirements of the appellee's various brands of gasoline and motor fuels, lubricating oils, and miscellaneous petroleum products, at a price for gasoline and motor fuels five cents per gallon under the current tank wagon price in Baltimore at the time of delivery; the prices of other products to be adjusted from time to time by mutual agreement of the parties, the gasoline and petroleum products to be sold by the appellant, "exclusively in the name of and as the products of" the Interocean Company. There was a provision that the books, etc., of the appellant should be kept by the appellee, for which it was to receive one-half cent per gallon for all gasoline sold the appellant, but this provision was never observed by either party. The agreement also contained a provision as follows: "All settlements between the parties hereto to be made on the first Monday of each succeeding month." And it is the non-observance by the appellant and the alleged indulgence of the appellee of this provision on which the decision in this case must largely rest.

At the trial of the case the appellant offered evidence to the effect that, shortly after the written contract was made, it was agreed that the appellant should receive a commission of one cent per gallon for securing tank wagon customers for the appellee, and contended that this was an oral alteration or amendment of the written agreement. It was a separate and distinct transaction, and in our opinion was not a part of the original contract and was independent of it.

By letters of the Shriver Company of March 27th, 1924, and of the Interocean Company of March 31st, the Interocean Company allowed the Shriver Company an additional half cent for tank wagon deliveries to the Shriver Company's Baltimore stations, making a total differential of 5½ cents per gallon, in consideration of the Shriver Company furnishing at its expense all pumps, tanks, and other installations at its service stations, including sign boards and electric signs,

the increase not to apply to tank car deliveries, the Interocean letter concluding, "All other provisions of our contract with you to remain in full force and effect."

According to the testimony it was orally agreed that the Shriver Company should receive an additional half cent per gallon in the Westminster territory. There was no dispute about this. There appears to have been no other alteration in the agreement and understanding of the parties until January 30th, 1925, when the Shriver Company wrote the Interocean Company as follows:

> "With further reference to the matter under discussion, we beg to submit herewith the following proposition for your acceptance:
>
> "We propose to continue to buy Interocean gasoline from you in accordance with the terms of our contract and its supplements and to take a minimum of 5,000 gallons per month; and such additional amounts as our requirements may demand from time to time.
>
> "You to store approximately 50,000 gallons of benzol free and to mix without cost to us in accordance with our specifications.
>
> "Deliveries of motor fuels and gasoline to our service stations to be made as heretofore under contract, and for deliveries to our tank wagon customers we will agree to pay you 1½ cents per gallon over our contract price for such deliveries. *Deliveries to be made and marketed under our trade name.* All pumps and tanks to be furnished and installed by us.
>
> "We ask you to write us that this agreement shall be considered as an amplification of the existing contract dated May 20th, 1923, and to be supplemental to it."

It was agreed at the trial that "May 20th, 1923" should read "December 20th, 1923," the date of the original contract. This was answered by the Interocean Company in a letter dated February 2nd, 1925, suggesting some other terms and conditions, which was answered by a letter of the Shriver.

Company dated February 4th, putting up an argument for the acceptance of its proposition, and by letter dated February 5th, 1925, the Interocean Company wrote the Shriver Company a letter as follows:

> "We are in receipt of your letter of February 4th and note that you object to contributing in any way towards the expense of delivering your proposed new benzol blend motor fuel to your service stations. We now refer to your proposal of January 30th, 1925, which is hereby accepted."

the receipt of which was acknowledged by a letter from the Shriver Company dated February 10th, 1925.

The next step in their transactions was a letter from O. E. Thurber, vice-president of the Interocean Company, to the Shriver Company, dated March 16th, 1925, as follows:

> "Notwithstanding that you have broken your contract with us, we are prepared temporarily to furnish you with straight gasoline at your stations at the same price as stated in the contract, but these deliveries are not to be considered as deliveries under the contract and are without prejudice to our claim that your contract with us has been broken. In case you want deliveries as aforesaid, please notify Mr. Brown what your requirements are."

Two letters were written the next day by the Shriver Company to the Interocean Company, which expressed the shock of the appellant and recalled a very pleasant visit of one of the Shrivers to the home of the vice-president of the Interocean Company the Sunday before, at which time there was no note of dissatisfaction.

Under date of March 20th, C. A. Kelly, auditor of the Interocean Company, wrote the Shriver Company:

> "We beg to hand you herewith statement of your overdue account. It will be necessary to make prompt payment of the overdue bills to enable me to approve further deliveries to your stations."

On March 24th the Shriver Company remitted for the accounts of December, 1924, and January, 1925, and the account for February, 1925, was paid on March 26th.

During the fifteen months the parties had done business this was the first complaint made by the Interocean Company of delay in payment by the Shriver Company. The original agreement provided for settlements on the first Monday of each month for bills of the preceding month, but it had not been observed and settlements were nearly all from two to four weeks late and were made, as to appellant's service stations and its tank wagon customers, after the bookkeeper of the Interocean Company had checked the previous month's account. Tank car lots were billed by the appellee from its New York office and were paid within thirty days after receipt of monthly statements. The appellant's reason for failure to pay the December, 1924, and January, 1925, accounts was its inability to get the appellee's bookkeeper to check the accounts for those months, and later on it gave the same reason for the delay in payment of its September and October, 1925, accounts. The appellee's bookkeeper testified that duplicate delivery tickets, showing by dates the gallons of oil and gasoline delivered to the Shriver Company in September and October, 1925, the accounts sued on, were delivered to the appellant and were followed the next day by invoices showing deliveries and prices. The Interocean Company continued to furnish the Shriver Company its requirements of straight gasoline, benzol, and other products, and to render the service covered by the contract, until August 15th, 1925, when it wrote the Shriver Company as follows:

"On and after August 15, 1925, we will discontinue furnishing you with gasoline and gasoline for motor fuels for delivery to your tank wagon customers. This confirms conversation with your Mr. Marston today."

By letter of August 13th, 1925, the Shriver Company had written the Interocean Company:

"We are in receipt of a notice from your local representative and agent to the effect that after August

15th next you will make no further deliveries to our tank wagon customers.

"As you must know, failure to make such deliveries constitutes a breach on your part of the contract between us; it will involve a very heavy loss to us.

"We deny your right to discontinue the deliveries and insist upon full compliance by you with the terms of our agreement: for all loss that we may sustain we intend to hold you responsible."

From the 15th day of August the deliveries only included straight gasoline and lubricating oils, the storage and delivery of benzol having ceased on that day, and that is the day from which the appellant's claim of set-off began. The delays in payment of monthly bills prior to March 16th, 1925, continued to the month of October, 1925, when deliveries ceased.

In its letter of March 16th the Interocean Company had not specified the breaches or violations of the agreement of December, 1923, and the supplements thereto, and, after the Shriver Company had twice written for information in this respect, the Interocean Company on April 6th, 1925, wrote as follows:

"We are in receipt of your favor of the 3rd instant making inquiry as to wherein you had broken your contract. Our notice to you of breach of contract was based on two considerations: First, the removal by you of the word 'interocean' from your advertising. Second, your failure to pay your account."

This was answered and argued by the Shriver Company, and the next step in the correspondence was a letter from Mr. J. Cookman Boyd, attorney for the Interocean Company, to the Shriver Company, dated October 19th, 1925, which is as follows:

"In the spring of 1925 you were notified by the Interocean Oil Company that you had breached the contract existing between you and the said Interocean Oil Company by reason of the failure to pay the amounts due as per the terms of the contract, as well as your failure to carry out one of the main reasons

for entering into the contract, to wit, the clause with reference to the sale of Interocean products only under the name of the Interocean Oil Company and the advertising of the same at your respective stations.

"Notwithstanding this breach on your part, however, the Interocean Oil Company, without prejudice to itself, continued to carry out its contract with you as though the same had not been breached by you.

"Some time since I spoke to your Mr. William and your Mr. Robert Shriver about the advertising feature of the contract and stated that the Interocean Oil Company would carry on the terms of its contract with you providing you lived up to your agreement, to wit: the prompt payment as per the terms of the contract, of the amounts due when they became due, and the selling of the products under the name of the Interocean Oil Company. Thus far, neither one of these things has been done by you.

"Your September invoice, amounting to $5,512.02, should have been but was not, paid on the 5th of this month. Also, there is due for pumps and tanks the sum of $1,725.00, one-half of which was due October 2nd and the other half November 2nd.

"In addition, nothing has been done by you in the matter of the sale of the products under the name of the Interocean Oil Company.

"I am writing to state that the question of the continuance of this contract rests entirely with you, upon the sole condition that you carry out the terms of your contract, both as to payment and trade name, and that unless same is done forthwith and hereafter, the Interocean Oil Company will consider the contract definitely and purposely breached by you and will act accordingly."

Mr. Boyd wrote the Shriver Company again on October 31st, 1925, and after repeating his letter of the 19th, said:

"You have paid no attention whatsoever to the above, your invoices have not been paid, you have taken no steps to comply with the terms of your contract, and your action leads the Interocean Oil Company to the

inevitable conclusion that the contract has been definitely and purposely breached by you.

"I am, therefore, writing on behalf of the Interocean Oil Company to notify you that after this date there will be no further deliveries to you of gasoline or blended gasoline, nor will there be any further blending of mixtures for you by the Interocean Oil Company, and all business relations will cease with you as from this date."

It is apparent that the Interocean Company strongly relied on the elimination of its trade name from the gasoline stations as the ground for cancelling the contract, but the trial court held that this was agreed to by the Interocean Company when, on February 5th, it accepted the Shriver Company's proposal of January 30th, which contained the sentence, "Deliveries to be made and marketed under our trade name," and the court so instructed the jury, and with that instruction we agree.

The remaining question, that is, the failure of the Shriver Company to pay its bill in accordance with the agreement on the first Monday of March, 1925, came up on a proffer of the appellant to show that payments for thirty-one tank car purchases were billed from the New York office of the appellee, the bill heads containing the words "thirty days net" at the price fixed by the contract, and that all were paid within thirty days of the bill dates except invoices for November 3rd and 5th, 1924, which were paid December 6th, and the invoice of November 4th, which was not paid until January 9th, 1925. It does not appear whether the terms "thirty days net" were printed on the billheads, but if printed thereon, with no evidence that the appellee intended to enlarge the provision for payment on the first Monday of the month, that alone would not have the effect of extending the time stated in the contract, though remittances to New York for tank car shipments were customarily made and received within thirty days from invoices, and in any event were not payable before bills for the same were received by the appellant.

There was evidence that none of the bills for any month were paid by the first Monday of the succeeding month, and that the Shriver Company never paid according to the contract and that the Interocean Company never demanded payment until it sent the letter of March 16th, 1925, whereby it undertook to summarily cancel the contract; and this reason was not assigned until the letter of April 6th was written by the Interocean Company. To the proffer, the court ruled on the whole question of the construction of the contract as of February 5th, 1925, and the effect of the waivers of prompt payment preceding March 16th, 1925, as follows:

"The aforegoing tender of evidence is refused by this court on the ground that the undisputed testimony so far offered in the case shows that the Shriver Oil Company, by its letter of January 30th, 1925, referring to contract expressed therein dated May 20th, 1923, but meaning really the contract of December, 1923, the original mentioned in the declaration in evidence in this case with certain modifications and changes, offered to confirm the original contract of December, 1923, and said modifications and changes do not refer to the method or time of payment by the Shriver Oil Company to the Interocean Oil Company of goods delivered the preceding month. This letter of January 30th, 1925, and its terms were acknowledged and the terms accepted by the Interocean Oil Company under date of February 5th, 1925. The court holds as a matter of law that notwithstanding there may have been waivers of the provisions of the original contract relating to payment for goods, theretofore, that the legal effect of the letter of January 30th, 1925, and the answer thereto of February 5th, 1925, was to reinstate the original contract of December, 1923, in all its original vigor, force and effect as regards the time and terms of payment. Hence the tender of the testimony tending to show a waiver of the contract provisions regarding payment prior to January 30th, 1925, is in the opinion of the court immaterial."

And this is the construction which the court submitted to the jury by the appellee's first prayer. The appellant vigorously contends that the construction of the contract should

have been submitted to the jury because it was partly written and partly oral. If there had been any evidence that the parties differed as to the oral parts of the agreement its contention would have weight, but there is no evidence that the parties were not in accord as to the oral understandings, and where there is no dispute on the facts it is a question of law for the court. *Dorrance v. Hoopes,* 122 Md. 345, 351. Both parties knew what the contract was, and the only question here is as to whether the proposal of January 30th by the Shriver Company and the acceptance of February 5th by the Interocean Company was a continuation of the original contract with modifications or a new contract. If a supplement to the old, then the waivers of the time of payment of the monthly accounts would apply to the situation on March 16th, 1923, while if it made a new contract, then the indulgences of the appellee prior to that date would avail the appellant nothing.

As said in *Bollman v. Burt,* 61 Md. 415, 423, "In the construction of contracts it is seldom that we can derive much aid from decided cases, inasmuch as the intention of the parties in each contract is the controlling question," and in *Bond v. Humbird,* 118 Md. 650, 658, "obviously the most simple and satisfactory way to ascertain that intention is to read what they have written in the light of surrounding circumstances existing at the time. What they meant to say must be gathered from what they did say, as viewed from the standpoint they then occupied." The court said the effect of the letters of January 30th and February 5th "was to reinstate the original contract of December, 1923, in all its original vigor, force and effect as regards the time and terms of payment." The original agreement as modified to that time was in force and the dealings of the parties were all had with respect to it. Operations had not been suspended under it, and if the letter of January 30th had not been written or had not been accepted, the original contract, with the modifications theretofore agreed to, would have controlled the transactions between the parties. The last sentence in the letter of January 30th was: "We ask you to write us that this

agreement shall be considered as an amplification of the existing contract dated May 20th, 1923 (agreed that writer meant December 20th) and to be supplemental to it." This does not sound like a reinstatement of a contract, but the addition of something to it, the addition not referring to times of payment or settlement. That was the time for the Interocean Company to say it would accept on condition that the account to February 1st be paid and that no further indulgence would be allowed, if it intended thereafter to hold the appellant to the letter of the contract. There is no evidence in this case that the appellant was put on notice that the attempted cancellation was on account of its laxity in paying its bills until it received the letter of April 5th, and even after that it was allowed considerable grace in the payment of its monthly bills. If the appellee had given such notice to the appellant as Mr. Boyd did in his letter to the appellant of October 19th, 1925, and it had not paid its account within a reasonable time thereafter, it would have no cause to complain. We cannot agree with the trial court that the attitude of the parties toward the original agreement had caused it to lose any of its force and effect, or that the parties meant by the letters of January 30th and February 5th to start all over again. The original contract was for ten years, with eight years and ten months yet to run, and the supplement was not going to add to or subtract a day from it; it had just as long to run with the letter of January 30th as without it.

When payments have been customarily received later than a day specified and the dealer decides to disallow any further grace, in order to put himself in position to rescind for failure to pay on time he must give the debtor notice that the terms of the contract must be observed, or that no further delays will be tolerated. This is the rule laid down in the instruction approved by this court in *Sullivan v. Boswell*, 122 Md. 539, 544, which is as follows:

"If the court as a jury shall find that the plaintiffs from time to time accepted payments for coal after the stipulated times and thereafter shipped more coal, then these facts are

facts from which the court as jury may find that the plaintiffs had waived and lost the right to rescind for breaches of said term theretofore made, and the law is that they could not, after such waiver, if such be found, recover the right to rescind for future breaches of said term as to payment without some notice to defendant that they intended thereafter to strictly enforce such term, and opportunity after said notice to the defendant to comply strictly with said term." See *Williston on Sales* (2nd Ed.), sec. 192; *Black on Rescission and Cancellation,* secs. 215, 219; *Bollman v. Burt, supra; Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 112 Md. 437, 446; *Williston on Contracts,* secs. 741, 856.

The appellee, after indulging the appellant every month for fifteen months, could not summarily rescind its contract as was attempted by its letter of March 16th, supplemented by its letter of April 6th. In neither of these did it advise the appellant in terms that thereafter prompt payment of its monthly accounts would be expected on the first Monday of each succeeding month. Its letters of these dates amounted to no more than a warning to the appellant that it should put its house in order and faithfully keep its part of the bargain. The appellant had a valuable contract with the appellee, and ordinary prudence should have prompted it to pay its accounts when due; that is all it had to do to preserve its rights. But the appellee did not appear to be sure of its ground, as it offered to continue furnishing gasoline at its contract price, and in the letter of October 19th the existence of the contract was recognized when it said, "the question of the continuance of this contract rests entirely with you, upon the sole condition that you carry out the terms of your contract, both as to payment and trade name," the last condition not being a valid reason, as we have said. It was not until the letter of Mr. Boyd of October 19th that a notice in conformity with the instruction in *Sullivan v. Boswell, supra,* was given by the appellee to the appellant, and it then became a question for the court as to whether the appellee's letter of October 31st allowed the appellant a reasonable time for com-

pliance with the notice of the 19th, leaving also the question to the jury whether the appellee had kept its part of the bargain.

The ruling of the court on the proffer of evidence of former indulgences of payment to the appellant, and limiting proof to transactions subsequent to February 5th, 1925, we think was reversible error, and the appellant should have been allowed to show the times of payment of the monthly accounts, not only prior to the 16th day of March, 1925, but to the 19th day of October, 1925. This disposes of the appellant's third and fourth exceptions.

The appellee's first prayer is erroneous because it confines the question of waiver of payments to the time subsequent to February 5th, and assumes that on that date a new contract had been made by which the appellee could demand payment on the first Monday of March for gasoline furnished during the preceding calendar month, and that upon the failure of the appellant to pay on that day the appellee could cancel the contract. This prayer instructed the jury that if they should find "that between said 5th day of February and 16th day of March, 1925, there had been no waiver of the terms as to the time of said payment as to tank wagon deliveries, then the said contract was broken by the defendant and their verdict on defendant's plea of recoupment or set-off must be for the plaintiff." We hold that the notice of March 16th, 1925, did not have the effect of cancelling the contract on that day, and that the letter of October 19th, 1925, was the first notice to the appellant that, if it did not promptly pay its overdue account for September and thereafter pay in accordance with the terms of the contract, the relations between the parties under it would terminate. The evidence is that no response was made to the letter of October 19th, when the letter from the appellee of October 31st was written, wherein the appellant was advised that the appellee refused to continue their contractual relations. *Sullivan v. Boswell, supra.* The prayer also left it to the jury to find whether there had been a waiver of the time of payment by the appellant between February 5th, 1925, and March 16th

following, without a statement in the instruction as to what facts, if found, would constitute a waiver. "In determining whether there has been a waiver, it generally happens that there are facts which must be submitted to the jury, but the court instructs the jury as to the legal effect of their finding of such facts." *Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 112 Md. 437, 444; *Phillips Co. v. Boyer & Co.,* 133 Md. 119, 129.

With this view of the case, the question will arise on a retrial of the reasonableness of the time limit which the appellee fixed in its letter of October 19th as evidenced by the letter of October 31st. There is evidence that payment was made from month to month after the accounts were checked by the appellee's bookkeeper, and in order to end this practice, reasonable notice should have been given the appellant that it should be discontinued and payments made thereafter in accordance with the contract. This the letters of October 19th and 31st undertook to do, but inasmuch as only the September account was due when both letters were written and the October account would not be due until the first Monday of November, the rescission was premature as to October. Assuming, but not deciding, that it might have been reasonable as to September, it could only apply then if the jury should find the invoices sent to the appellant for that month to be correct.

But there is another and better reason for holding the letters of October 19th and 31st ineffectual as a rescission or cancellation of the contract. We hold that the letters of March 16th and April 6th, 1925, did not have the effect of rescinding the contract, and that the practice of the parties with respect to the prior delays in the payment by the appellant of its monthly accounts should have been submitted to the jury.

On August 15th, 1925, the appellee wrote the appellant that some very substantial items in the contract would no longer be furnished by it. There was, therefore, for more than two months before October 19th, a substantial breach of the contract by the appellee, which disentitled it at that

time to rescind. If the party first in default was the appellee, it would not be in position while in default to cancel for the subsequent breaches of the appellant. In that event the appellee could not refuse to continue its part performance of the contract until and when the appellant itself failed to comply with the provisions of the contract with respect to the part performance. *Parker Vein Coal Co. v. O'Hern,* 8 Md. 197; *Black on Rescission and Cancellation,* sec. 196; *Elliott on Contracts,* sec. 2026; *Williston on Contracts,* sec. 871. The appellee is under the necessity of showing it had done all that it was required to do in order to entitle it to performance by the appellant. 6 *R. C. L.* 925. Whether a party to a contract had good reason to rescind is a question of law for the court (*Burroughs v. Langley,* 10 Md. 248; *Baltimore v. Schaub Bros.,* 96 Md. 534), and in the opinion of this court the appellee had no right to rescind so long as it failed substantially to comply with its part of the contract, unless it had been first breached by the appellant.

The appellant's first prayer, which was refused, submitted its claim of set-off for the damages which it had suffered by the refusal of the appellee to meet its requirements under the contract of December, 1923, and supplements, and was good under the view we take of the existence of the contract after August 15th, but it should be qualified or granted in connection with an instruction that it could only recover, if at all, up to the time that the appellant had breached the contract, if they should find such breach. See *Williston on Contracts,* sec. 1468.

The appellant's third prayer should have been granted, as it correctly stated the rule herein quoted from *Sullivan v. Boswell, supra.* The appellant's first and second exceptions, which were to rulings on the evidence, were abandoned. The fifth, sixth, and seventh exceptions were taken to the sustaining of objections to questions as to whether the appellee had sold or was about to sell its business to another corporation. The question should have been allowed, though there was no reversible error in this case, because the fact was admitted at the trial. When the appellee went out of business,

it made it impossible for it to complete its performance of the contract, and its course amounted to a repudiation of the obligations of the contract, unless the assignee assumed the burden of the contract, and it was acceptable to the appellant. *Crane Ice Cream Co. v. Terminal Freezing Co.*, 137 Md. 588, 597; *Eastern Advertising Co. v. McGaw*, 89 Md. 72.

> *Judgment reversed, with costs to the appellant, and new trial awarded.*