BRACY et al. v. LURAY.

GROSSMAN v. SAME.

Civil Actions Nos. 1744, 1786.

District Court, D. Maryland.

Oct. 16, 1946.

Daniel E. Klein, of Baltimore, Md., for plaintiff.

William Saxon, of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a proceeding under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219.

The defendant, a former employer of the plaintiffs, has filed a motion to quash attachments and executions laid by the plaintiffs to realize on judgments which they obtained against the defendant in this Court, and to have those judgments entered as fully settled and satisfied. Plaintiffs, in turn, have filed a motion to have defendant's motion dismissed. The sole question now at issue is as to which of these two motions should prevail.

The present litigation originated in a suit brought by the plaintiffs against the defendant to recover alleged underpaid minimum wages, overtime compensation, and also an additional equal amount as liquidated damages and for an attorney's fee under Section 16(b) of the Act, 29 U.S.C.A. § 216(b). This Court, after due hearing, gave judgment for the defendant, 49 F.Supp. 821, but on appeal this judgment was reversed, 4 Cir., 138 F.2d 8, and the case remanded for further proceedings to determine the amounts due the various plaintiffs. Thereupon, the matter was referred by this Court to a Special Master, who made his findings which were approved by this Court; judgments in favor of the plaintiffs were entered; no further appeal was taken, the judgments became final, attachments were laid and execution levied on defendant's property, but, thereupon, the parties entered into an agreement for compromise and satisfaction of the judgments.

The positions of the parties on the present pleadings may be stated as follows: It is the position of the defendant employer that the formal written agreement between him and the plaintiffs, dated August 31, 1944, compromising the amount of the judgments, the defendant being without sufficient assets to satisfy the judgments in full, legally supplanted any rights that the plaintiffs may have had under their judgments, and that this agreement still persists and is enforcible. On the other hand, plaintiffs contend that whereas such agreement was entered into, it is not now enforcible, if it ever was, in view of the recent decisions of the Supreme Court in Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, and D. A. Schulte, Inc., v. Gangi, 66 S.Ct. 925.

Of course, if this agreement of compromise with respect to the judgments is not now valid and subsisting, we do not need to consider the question whether or not the decisions, just referred to, prohibit the settlement embraced in this agreement, which was in effect a settlement on the basis of fifty per cent of the judgments that had been obtained; that is, it relieved the defendant of the obligation to pay the liquidated damages provided for in Section 16(b) of the Act.

■ As already stated, the judgments obtained by the plaintiffs are no longer open to attack, the time having passed within which they might have been reviewed on appeal. So we will pass at once to a consideration of the questions (1) whether the compromise agreement of August 31, 1944, was a valid agreement, and (2) if so, whether it is still binding upon the parties to it.

First, we find—without quoting or referring here to the specific provisions of the agreement, which is quite lengthy—that, when entered into, it was a valid contract of compromise and settlement between the parties.

Second, we find that it was breached by the defendant employer in a material sense, in that the provision of the agreement requiring regular monthly payments by the defendant, while lived up to for most of the period—14 months in all—was not fully lived up to. As the later installments became due, there was a default. That is to say, whereas all of the payments were to have been completed by November, 1945, as a matter of fact they were not all completely made until March 18, 1946. Default in payments according to the prescribed regularity began in June, 1945; and although by that time, it is true, about four-fifths of the indebtedness of the defendant under the agreement had been liquidated, nevertheless, the default was a material one, and therefore must be held to have constituted a material breach of the contract on defendant's part. It therefore becomes necessary to determine whether, as defendant contends, this breach was waived by the plaintiffs.

■ Speaking broadly, the law of waiver is not standardized by principles that are always easy of statement, or of being completely distinguished from those which govern the law of election or estoppel. But it is clear that a waiver may, and frequently does occur not only by virtue of some affirmative conduct, but through some omission on the part of a given party to do something that the other party may reasonably expect him to do. If such is not done, the other party may properly assume that the default has been legally waived, and such position is frequently upheld on equitable principles, even though it may be difficult to show that there would be any real detriment caused the party who relied upon the waiver, if he were not permitted to assert it.

■ Bearing in mind those principles, and applying them to the evidence in the present case, we feel the weight of the credible evidence is sufficient to require a holding that, whereas there was a breach of a material character, the conduct of the plaintiffs was such that they did not sufficiently indicate, until too late, their intention not to waive the breach and accept the payments as made in full satisfaction of the judgments for which the contract, under which the payments were made, was a substitute.

As already said, the plaintiffs ultimately received all that they were entitled to by way of instalment payments under the

contract of August 31, 1944; that is, their attorneys received and deposited for collection all of the several monthly payments. It is true that from time to time, when the over-due payments were received, one of their then attorneys wrote that the acceptance of such payments was not to be regarded as a waiver of the breach of the agreement. Nevertheless, if we consider these letters in the light of the entire conduct of the plaintiffs and their attorneys, the conclusion is inescapable that plaintiffs postponed, for an unreasonably long while, any attempt to declare a breach of the contract, and to revive the judgments. This conclusion must be reached not so much from anything that transpired by letter or word of mouth between the parties, as from the lapse of time and the attitude of counsel for the plaintiffs. For example, on January 3, 1945, Mr. Loeffler wrote Mr. Luray and, among other things, said:

"Though a reminder of the $200 payment that was due on January 1 was sent you a week previously, we have not yet received that installment which constitutes a breach of the agreement. The judgment creditors, whom we represent, only accepted the proposition you submitted upon your distinct and unequivocable promise to make these payments punctually.

"I have tried to emphasize this fact previously because *I am quite sure they would insist upon declaring a forfeiture of the payments hitherto made and claim restoration of the original amounts due.*" (Italics inserted.)

This same position is supported by statements in various other letters. However, it is significant that although all of these payments—some of them quite late—were received, deposited for collection, settlements made with the various plaintiffs, and other payments made in accordance with the contract, nothing affirmatively was done to repudiate the compromise agreement until August 9, 1946; that is, some five months after all payments were completed. Furthermore, there is considerable testimony which has not been successfully refuted, to the effect that when Mr. Luray and his son, who was associated with him in business, asked for more time within which to pay the installments, it was not only granted but they had a right to believe that although formal letters, previously referred to, were written, saying that the breach would not be condoned, nevertheless, it was being condoned; that is, the defendant was given indulgence a number of times, and then, after the final payment was made and accepted, the plaintiffs did nothing to assert their rights under the judgments as entered, and to repudiate the contract, until as late as August, 1946, five months after the last payment was made.

We are not unmindful of the fact that although, through his attorney, defendant had asked for, he did not insist upon, the surrender of the releases which had been signed and held in escrow, pursuant to the terms of the contract, so that he might enter the judgments settled, and close the matter completely. However, the defendant's attitude was reasonable because, by the weight of the credible evidence, the then attorneys for the plaintiffs, Messrs. Loeffler and Goertz, did not disclose any real intention, nor did their clients, of pursuing the matter further. If they actually had had such intention, they were legally obligated to have taken some affirmative action before letting such a lengthy period as five months go by.

It is true letters were written, as has been pointed out, saying that the over-due payments were received only as a credit against the judgments as a whole. But such presumption of absence of intention to forgive the delay, as the phraseology of those letters indicates, is overcome, as is also the provision in the contract making prompt payment of every installment of the essence of the contract, by the conduct and the delay on the part of the plaintiffs themselves, and their counsel. See Williston on Contracts, Rev.Ed., Vol. 3, Sec. 856; Shriver Oil Co. v. Inter-Ocean Oil Co., 157 Md. 341, 146 A. 223; Kemp v. Weber, 180 Md. 362, 24 A.2d 779. Indeed, we cannot blink the fact that the original counsel for these plaintiffs retired from the case and did nothing whatsoever to press the position now assumed on behalf of the plaintiffs, and such was not done until the entry of Mr. Klein, counsel

for the plaintiffs, who did not represent the plaintiffs at all until August 9, 1946.

Having reached the conclusion that the defendant had the right to treat the compromise agreement as subsisting, it becomes necessary to rule upon plaintiff's contention that that agreement is, nevertheless, still of no avail to defendant because of the Supreme Court's decisions in Brooklyn Savings Bank v. O'Neil, and Schulte v. Gangi, supra.

Briefly stated, the earlier of these cases, the Brooklyn Savings Bank case, decided that an employee's release and waiver of his right to minimum damages and liquidated damages under the Fair Labor Standards Act, in consideration of a sum known by both employer and employee to be less than the statutory minimum wages due, was void. The Schulte decision went a step further and held that the Fair Labor Standards Act precludes the settlement of even a bona fide dispute over the coverage of that Act on a claim for both overtime compensation and liquidated damages where the employees received overtime compensation in full.

In neither of these cases, and, indeed, in none of the cases that the Court has been referred to or has found, had the proceeding progressed to a finality, that is, to a final judgment, as the present proceeding has done. So the question, stated succinctly, is merely this: Is there anything in those decisions to indicate, directly or impliedly, that the Supreme Court meant to say that after an employee has had his full rights under the Fair Labor Standards Act adjudicated to a finality, and after those rights have been crystallized into a judgment, he cannot, even then, be bound by an agreement to take less than that judgment, although it is to his advantage to do so?

■ We find nothing in those decisions that requires such a radical extension of the principle which those decisions announce. Indeed, such extension would be contrary to public policy generally and to the interests of employees specifically. It is true there is a good deal of language, particularly in the Brooklyn Savings Bank case, which is very broad and which, if taken in whole cloth, without application to specific facts, might seem to indicate that the employee is *at no time* to be treated as a free agent, with the right to take less than he is entitled to under the Act. But it is essential to bear in mind that there is a basic distinction between the facts in those decisions and the facts before us, namely, there the compromise settlement was *made in advance* of any final determination of the employee's rights, whereas here it was made *after such* determination. For example, in the Brooklyn Savings Bank case it was said (324 U.S. 697, at page 704, 65 S.Ct. 895, at page 901, 89 L.Ed. 1296): "Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate. With respect to private rights created by a federal statute, such as section 16(b), the question of whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute." But the right that has been waived in the present case is not a statutory right in the sense referred to in the Brooklyn Savings Bank case, because here the statutory right had been fully adjudicated and acquired.

Again, in the same case, the Court said (324 U.S. 697, at page 708, 65 S.Ct. 895, at page 902, 89 L.Ed. 1296): "The same policy which forbids waiver of the statutory minimum as necessary to the free flow of commerce requires that reparations to restore damage done by such failure to pay on time must be made to accomplish Congressional purposes. Moreover, the same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer in determining whether so little damage was suffered that waiver of liquidated damage is called for."

In the present case the employees saw fit to have the courts litigate their rights and reduce them to final judgment. How can these employees any longer be said to need protection from their employer "because of inequality of bargaining power"?

They have been awarded their full rights with respect to which their bargaining power is said to be unequal. The bargaining that is interdicted can no longer occur. The present plaintiffs were willing to take less because "a bird in the hand is worth two in the bush". They felt that to wait to execute on their judgments would probably amount to their getting very much less than they could get by a settlement. Indeed, they might get little or nothing by waiting.

The Supreme Court further said in the Brooklyn Savings Bank case (324 U.S. 697 at page 709, 65 S.Ct. 895, at page 903, 89 L.Ed. 1296): "To permit an employer to secure a release from the worker who needs his wages promptly will tend to nullify the deterrent effect which Congress plainly intended that section 16(b) should have. *Knowledge on the part of the employer that he cannot escape liability for liquidated damages by taking advantage of the needs of his employees tends to insure compliance in the first place. To allow contracts for waiver of liquidated damages approximates situations where courts have uniformly held that contracts tending to encourage violation of laws are void as contrary to public policy.*" (Italics inserted.)

The contention advanced on behalf of the plaintiffs comes to this: That even though it will clearly result in less compensation to the employee, nevertheless, he must endeavor to collect in full any judgment that he may obtain under the Fair Labor Standards Act instead of settling it. But the Supreme Court has not gone this far. In the Schulte case the Court said (66 S.Ct. 929): "We think the purpose of the Act, which we repeat from the O'Neil case was to secure for the lowest paid segment of the nation's workers a subsistence wage, leads to the conclusion that neither wages nor the damages for withholding them are capable of reduction *by compromise of controversies over coverage.*" (Italics inserted.)

Finally, any doubt that may exist as to the proper interpretation to be given to what the Supreme Court has decided, is dissipated by the following, contained in a footnote to the Court's opinion in the Schulte case:

"Settlements of controversies under the Act by stipulated judgments in this Court are also referred to by petitioner. North Shore Corporation v. Barnett et al., 323 U.S. 679, 65 S.Ct. 275 [89 L.Ed. 551].

"Petitioner draws the inference that bona fide stipulated judgments on alleged Wage-Hour violations for less than the amounts actually due stand in no better position than bona fide settlements. Even though stipulated judgments may be obtained, where settlements are proposed in controversies between employers and employees over violations of the Act, by the simple device of filing suits and entering agreed judgments, *we think the requirement of pleading the issues and submitting the judgment to judicial scrutiny may differentiate stipulated judgments from compromises by the parties. At any rate the suggestion of petitioner is argumentative only as no judgment was entered in this case.*" (Italics inserted.)

Certainly, the foregoing is a most direct statement on the part of the Supreme Court that it was not to be understood as embracing, in its opinion, compromise settlements made after judgment. Even in the absence of such an unequivocal statement, the same conclusion would necessarily be required from the Court's statement that stipulated judgments, if arrived at in a bona fide fashion, were not being frowned upon.

For the reason given, defendant's motion to quash the attachment, and to enter the judgments "settled and satisfied" must be granted.