HOME NEWS, INC. *v.* SEYMOUR P. GOODMAN
(Two Cases)
JOSEPH GOLDSTEIN *v.* SAME (Two Cases)
WALTER GOLDSTEIN *v.* SAME (Two Cases)
[Nos. 63-68, October Term, 1943.]

*Decided January 13, 1944.*

The causes were argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Michael J. Manley,* with whom were *Harley, Wheltle & Manley* on the brief, for the appellants.

*J. Cookman Boyd, Jr.,* with whom were *Boyd & Boyd* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

One Seymour J. Goodman, complainant below, appellee here, employed formerly as an advertising solicitor by the Baltimore Post, did not continue his position when that paper was absorbed by the Baltimore News in 1934. Messrs. Joseph and Walter Goldstein at that time were partners in a printing business using the name, Twentieth Century Printing Company. The Goldsteins had in their establishment a rotary press which they were anxious to keep busy. Goodman approached them with the idea of organizing a shopping paper in Baltimore to be owned and financed by the merchants and to be printed by the Goldsteins. The Goldsteins were interested in such a paper, but it later became apparent that the merchants were not interested. Later a shopping paper, known as the Home News, was organized and printed by the Twentieth Century Printing Company.

There is much dispute in the record as to the contract of employment made with the appellee, Seymour P. Goodman. It was verbal. The chancellor who heard the case below and who had the witnesses before him concluded from the conflicting testimony of the witnesses that the verbal contract of employment of Goodman, as an advertising solicitor, was substantially as follows: "'I (Goldstein) will pay 20% commission on all advertising that you secure for the paper as long as those advertisers continue to place advertising in the paper.' That figure of 20% commission did not apply to National Advertising for which the rate was 15% commission." Without reciting in this opinion the conflicting testimony offered to establish this contract, this court agrees with the chancellor that the contract of employment was as stated above.

Goodman continued to solicit advertising for Home News until 1938. At that time a dispute arose between him and Joseph Goldstein as to solicitation of new territory. Joseph Goldstein became irritated with Goodman and said that the paper belonged to him and told Goodman that he was going to run things around there to suit himself and if Goodman did not like it, he could get out, which Goodman did. Joseph Goldstein apparently regretted his action. Goodman later went back and had a conference with Joseph Goldstein, and Goodman agreed to come back with the understanding that his agreement was to continue on and that he was to receive commissions on all the advertising that he secured for the paper as long as those advertisers continued to place advertising in the paper. Seymour Goodman continued to work until April, 1941, when he became ill. He went to the hospital on April 22nd and remained there until July 21st when he went to Westminster, Maryland, for a rest. While in the hospital, he continued to receive weekly checks, based on his commissions on advertising which he had secured, until August 15, 1941, when he was sent checks for $50 per week for six weeks until September 26, 1941. He returned from West-

minster and went to the office of the Home News on October 13, 1941. He questioned Joseph Goldstein as to why his checks had been reduced to $50 and Goldstein questioned him about the sum of $7,000 which he said Goodman was to pay for a one-third interest in the Home News. Goodman continued soliciting advertisments until October 21, 1941. On that day, he and Joseph Goldstein had an argument about soliciting the account of Food Fair and, as a result of that argument, Joseph Goldstein discharged Goodman.

On June 5, 1942, the appellee, Seymour P. Goodman, filed an amended bill of complaint in Circuit Court No. 2 of Baltimore City against Home News, Inc., Joseph Goldstein and Walter Goldstein, asking that court for proper accounting to determine the amounts due the complainant from the defendants, that the defendants be directed to pay the complainant the amounts found to be due, that the court retain jurisdiction of the cause for amounts coming due in the future to the complainant, and for other and further relief. After answer filed, testimony was taken in open court before the chancellor, who decreed on July 9, 1943, that (1) the complainant, Goodman, was entitled to commissions at certain rates designated in the decree on all business received by the defendants or any of them for advertising in the Home News from certain customers set out in the decree between the 15th day of August, 1941, and the 21st day of October, 1941; (2) the complainant was entitled to commissions on all business received by the defendants or any of them for advertising in the Home News from certain customers set out in the decree since the 15th day of August, 1941, to the date of the decree; (3) the complainant was entitled to commissions on all business received by the defendants or any of them for advertising in the Home News from the customers and at the rates set forth in (2) such right to commissions to begin as of the date of the decree and to continue on a weekly basis, when and as long as advertising business is placed in the Home News by said customers.

The chancellor referred the papers to the court auditor to state an account and ordered the defendants to pay the costs. An appeal is taken to this court from that decree. After the auditor's account was stated, certain exceptions were taken to that account, and from the decree of the chancellor on the audit, a further appeal is taken to this court.

Was the chancellor correct in decreeing against all of the defendants, Home News, Inc., Joseph Goldstein and Walter Goldstein? The appellee was entitled to compensation. When the appellee, Goodman, approached the Goldsteins about the organization of a shopping paper to be printed on their rotary press, they were much interested for the reason that they desired the printing business. They paid the cost of the luncheon for the merchants when the idea was presented to them and also paid for the circulars distributed at the luncheon. Goodman was paid a weekly salary by the Goldsteins during the promotional period. He acted as chairman of the luncheon meeting, and Mr. Joseph Goldstein attended and had his secretary take minutes of the meeting, which did not result in the merchants forming such a paper. The Goldsteins undertook to publish and produce such a newspaper. Later a corporation, Home News, Inc., was formed. Walter Goldstein ratified everything that his partner did concerning the corporation and the operation of the paper. The appellee, Goodman, testifies that he was originally employed by Joseph Goldstein. The appellants offered testimony to the contrary. Although Joseph Goldstein testified that he had nothing to do with the paper until 1936, the record, however, reveals that he was the prime mover in the organization of the newspaper for the purpose of getting the printing and was elected a director of Home News, Inc., at the first meeting of the incorporators on September 27, 1934. All expenses incident to the publication of the newspaper before the incorporation were paid by the Goldsteins. The appellee testified that shortly before the incorporation was perfected, he, hearing of it, asked

Joseph Goldstein about it and was told by him: "Don't worry about that, that is merely a form to protect my interests in case I am sued, but I am the boss around here and you look to me." Appellee further said: "And I always did look to him up to the very last moment, and it continued all the time." The certificate of incorporation was approved by the State Tax Commission on October 2, 1934, at which time the corporation came into existence. The first issue of the paper appeared September 28, 1934. The incorporators were Edward E. Ullrich, an employee of the Twentieth Century Printing Company; Howard A. Burman, an advertising solicitor; and the attorney, Albert A. Levin. None of these incorporators had any money invested in the concern. All expenses of the incorporation had been paid by the Goldsteins. Ullrich was paid by the Twentieth Century Printing Company and was never paid anything by the Home News, Inc. Speaking of the Home News, he said: "It was to be my baby. It operated under the rotary press which was under my jurisdiction." At the first meeting of the incorporators held on September 27, 1934, Burman, Ullrich and Joseph Goldstein were elected directors. Home News, Inc., never had any assets or property of any kind. Mr. Ullrich testified that he thought that a drawing account for the Home News was put up by the Twentieth Century Printing Company and further testified that he was working for the Twentieth Century Printing Company, Home News and anything else that had anything to do with the working of the rotary press. Joseph Goldstein also signed a note for the Home News. He testified that he and his brother paid the debts of the Home News and also when asked how the Home News got any credit at the bank, he testified: "As long as the Twentieth Century Printing Company, of which I and my brother are partners, he and I operate the Home News, naturally the Twentieth Century Printing Company is looked upon as a guarantee for whatever accounts they owe." He also said that the Home News was operating on the credit of the Twen-

tieth Century Printing Company, and he and his brother who were operating as a partnership, stood back of the Home News and its obligations. The office, headquarters, bookkeepers and clerks of the Twentieth Century Printing Company and Home News, Inc., were the same.

The first meeting of the directors was held on January 11, 1936, when the resignations of Edward E. Ullrich as director and treasurer and Albert A. Levin as secretary were accepted. At that meeting, Walter Goldstein was elected director and treasurer and Joseph Goldstein was elected secretary, and both of the Goldsteins have been directors ever since. Apparently no stock was issued by the corporation until 1936. At a meeting on March 2nd of that year, the Goldsteins subscribed to 1500 shares of the capital stock of Home News, Inc., with the understanding that the proceeds of the subscriptions for this stock in the amount of $15,000 was to be paid to the Twentieth Century Printing Company on account of indebtedness due from Home News, Inc., and this stock was so issued. Present at that meeting were Howard A. Burman, president; Joseph Goldstein, director and secretary; and Walter Goldstein, director and treasurer, constituting all of the officers of said company. At a meeting on June 15, 1936, when the whole Board of Directors was present, at that time consisting of Walter Goldstein, Joseph Goldstein and Christian Rodekurt, the bookkeeper for Twentieth Century Printing Company, a motion was passed that Joseph Goldstein, elected president on April 21st of that year, be paid a salary of $4,000 a year and that Walter Goldstein, treasurer, be paid a like salary of $4,000 a year. At the directors' meeting on October 1, 1937, a resolution was passed authorizing the issuance of 500 shares of stock at the par value of $10 per share to Joseph Goldstein and a like amount of 500 shares at $10 a share to Walter Goldstein to appply on their salaries as president and vice-president of the corporation to September 30, 1937.

A prospectus was issued in October, 1937, and an editorial appeared in the paper stating that Home News,

Inc., was under the personal supervision and direction of its publishers, Joseph and Walter Goldstein, and offering stock for sale. In addition to the 2500 shares of stock theretofore issued to the Goldsteins, 10 shares were issued to a Mr. Greenbaum, 100 shares to a Miss Smith, 100 shares to a Mr. Hooper, 10 shares to a Mr. Getzendenner, and 100 shares to a Mrs. Manson, a sister-in-law of Walter Goldstein. One hundred twenty shares of this stock were paid back by the Goldsteins without any resolution made in the minutes. Mrs. Manson, who owned 100 shares, was paid 6 per cent. interest on the stock by Walter Goldstein, personally. Mr. Hooper was paid 6 per cent. interest on his 100 shares without resolution by the corporation to pay any dividends on stock. From all of this testimony, we can reach no conclusion other than that Home News, Inc., was really Joseph and Walter Goldstein and that Joseph and Walter Goldstein were really Home News, Inc.

The appellant corporation was formed primarily for the benefit of the Goldsteins, trading as Twentieth Century Printing Company. The Goldsteins ran both businesses. There is no evidence that any of the printing bills due Twentieth Century Printing Company were approved by the directors of Home News nor is there any evidence of another printer being given an opportunity to bid on the printing of the paper. The appellant corporation is insolvent as has been its condition since it was started and no dividend has ever been declared on the stock. "Where two or more persons are jointly interested to have certain services performed, they may be presumed to be jointly obligated unless there is something to indicate a different intention." 17 *C. J. S., Contracts*, Sec. 587, pp. 1228 and 1229. In the case now before this court, both Home News, Inc., and the Goldsteins were jointly interested in having the appellee secure advertisements, and they are jointly obligated. The contract of employment being made originally by Joseph Goldstein, he is, of course, liable for whatever compensation is due the appellee. Walter Goldstein, hav-

ing ratified and confirmed all his brother's acts, is also liable. The facts, of course, show that the appellee was also employed later by Home News, Inc., and that corporation is jointly liable. Although not in writing, the agreement is not within the Statute of Frauds. The main object is not to answer for the debts of another, but primarily to subserve the purposes of the Goldsteins. It is to be regarded as an original undertaking for the Goldsteins' own benefit, not merely as answering for the debts or default of Home News, Inc. The main object was to get business for the rotary press owned by the Goldsteins. *Small v. Schaefer*, 24 Md. 143; *Dryden v. Barnes*, 101 Md. 346, 61 A. 342; *Humbird v. Humbird*, 162 Md. 582, 586, 160 A. 623. The liability being jointly that of Home News, Inc., and of Joseph and Walter Goldstein, the chancellor was correct in decreeing against all of them.

This court having determined as a matter of fact that the appellee, Seymour P. Goodman, was employed by verbal contract, the agreement being that he was to receive commissions on all advertising which he secured for the paper as long as those advertisers continued to place advertising in the paper, we must decide whether the appellee's commissions should be limited to the actual contracts made by him with the advertisers or whether the commissions should continue on advertising secured from these customers after the termination of Goodman's employment as long as they continued to place advertisements in the paper.

This contract of employment, although verbal, is not within the fourth section of the Statute of Frauds applying to agreements not to be performed within one year from the making thereof. The statute does not apply if the contract can, by any possibility, be completed within a year, although the parties may have intended that its operation should extend through a much longer period, and in fact, it does so extend. It was said by this court in the case of *McGrath Co. v. Marchant*, 117 Md. 472, at pages 479 and 480, 83 A. 912, 914: "The decisions in

this state are uniform, and it is clear that such a contract does not come within the statute of frauds. In the case of *Ellicott v. Peterson's Ex'rs,* 4 Md. 476, the Court makes the statement followed in the later decisions in this state, that 'it has been held both in England and in these states the statute will not apply where the contract can, by any possibility, be fulfilled or completed in the space of the year, although the parties may have intended its operation to extend through a much longer period.' *Cole v. Singerly,* 60 Md. 348; *Baltimore Breweries Co. v. Callahan,* 82 Md. 106, 33 A. 460; *Lewis v. Tapman,* 90 Md. 294, 45 A. 459, 47 L. R. A. 385." *Fitzpatrick v. Michael,* 177 Md. 248, 254, 9 A. 2d 639. In this case, if the Home News had been discontinued within a year, the contract could have been terminated within that time although the parties intended that its operation should continue for a longer time, which actually occurred.

The contract of employment in this case was for an indefinite period of time, and it is admitted that it could be terminated at any time by either of the parties. *McCullough Iron Co. v. Carpenter,* 67 Md. 554, 11 A. 176. The following testimony was given:

"Q. Is that true, Mr. Goodman? A. As I was saying, I realized full well I could be kicked out at any time at all——

"Q. You could be discharged at any time?

"(The Court) He said he might be kicked out at any time. That is the reason he made that commission contract.

"(The Witness) Yes, sir." Although the contract was for an indefinite period and could be terminated at any time by the appellants, they were liable for the just compensation due the appellee. As a matter of fact, the record, in the opinion of this court, does not disclose any act of the appellee which terminated the contract. It was terminated by the appellants. They had a right to terminate the contract, and the discharge was lawful, but appellants were liable for the just compensa-

tion to appellee. We must therefore decide what compensation should be paid the appellee. The appellee contends that he is entitled to the compensation decreed by the chancellor. The appellants contend otherwise. It is admitted that, in order to secure advertising for this type of paper, it is necessary to frequently contact the various advertisers to see that they turn in their linage. The so-called contracts secured by the appellee were in substance options to place advertisements at a fixed rate and imposed no obligation on the customers to advertise at all. They simply gave the customer the option to place so many lines of advertising at a fixed rate. After these options were signed, it required solicitation to obtain the linage from the particular advertisers. It is admitted by the appellee that it was necessary for him to contact the advertisers to see that they turned in the linage for which they had options. The advertisers from time to time had to be stimulated to advertise, and he had to go back from time to time to see that the advertising was properly used and that the advertisers were satisfied. The contract of employment in the instant case is not similar to that of a solicitor of life insurance where that solicitor received his commissions on the premiums as long as they are paid. The notices are sent out by the insurance company for the premiums, and when they are paid, the solicitor receives his commission. Life insurance policies do not require servicing as do options for advertisements as in the instant case. In this case, the contract provided that the appellee was to receive commissions on all advertising that he secured for the paper as long as those advertisers continued to place advertising in the paper. In order for the advertisers to continue to place advertising, it was necessary for these advertisements to be secured. To secure advertising, solicitation, stimulation and frequent personal contact with the advertisers were necessary. Under cross-examination by the solicitor for appellants, appellee testified in part as follows:

"Q. Didn't you understand when a contract was signed, you are not entitled to any commission un-

til that linage is actually bought by the company? A. Well, of course, in billings, yes, sir. I wouldn't be entitled to commissions until it was billed. That is right.

"Q. Wasn't it necessary for you, then in the conduct of the business to contact with various concerns to see that they did turn in the linage? A. Well, in a general sense, that was the idea, sir, of course.

"Q. So that after you had obtained a contract for 10,000 or 20,000 lines, your work isn't ended, is it? A. My work was never ended, sir."

This employment was not of the kind which simply required the introduction of the customer and is different from the contract made in the case of *Hewins, Inc. v. Marlboro Cotton Mills,* 242 Mass. 282, 136 N. E. 159, 23 A. L. R. 449, relied on by the appellee, where the contract of employment provided: "If you ever submit any business to us and we take it and it is a brand new customer we have never solicited, we will pay you the commission on every pound of tire fabric that we ever ship, as long as we ever ship it'." It is also different from the contract in the case of *Levy v. Goldhill & Co.* [1917], 2 Ch. 297, stressed by the appellee, where the salesman sold sponges, brushes and hardware and where introduction was the main feature and in which the contract provided: "I agree to pay you half profits on receipts of orders (provided the customer is good). Same applies to repeats on any accounts introduced by you." Introduction of the customer might well be considered an essential feature in the case of *Bilbee v. Hasse & Co.,* 5 Times L. R. 677, 678, in which the contract was: "As regards your commissions, we hereby agree to allow you 1½ per cent. upon all orders executed by us and paid for by the customers arising from your introduction." The contract in the case of *Carnig v. Carr,* 167 Mass. 544, 46 N. E. 117, was one for permanent employment. In the case now before this court, introduction of the customer was a minor feature. In order to secure advertisements, much additional work is necessary.

This court is of the opinion that the case of *Scott v. Engineering News Publishing Co.*, 47 App. Div. 558, 62 N. Y. S. 609, Supreme Court of New York, is in point with the instant case, and we deem it advisable to quote the opinion, which is very appropriate here and which we consider to be the law of this case:

"The plaintiff appeals because the referee disallowed his claim to commissions upon new contracts made by the defendant after his discharge. It is not disputed that the employment was at will, and that the plaintiff's discharge was lawful. The finding upon which the referee's conclusion is questioned reads as follows:

" 'That some time in the year 1884 or 1885 the plaintiff and defendant mutually agreed that the plaintiff should procure orders or contracts of advertisements, west of the city of New York, for said periodical, and pay all his traveling and other expenses in procuring the same; that the defendant agreed to pay the plaintiff 25 per centum upon the amount of all orders or contracts of advertisements, and also upon all business that followed the original contracts; and that the parties introduced by the plaintiff were his customers.'

"Upon the contract as thus found, the plaintiff contends that he is entitled to recover his commissions upon advertisements received by the defendant, after his discharge, from customers whom he originally secured. The agreement as to commissions upon all business that followed the original contracts was founded upon the defendant's right to the plaintiff's continuous service. He was to have his commission upon all such business, not merely because he had secured these original contracts, but because he was there to aid, if necessary, in securing renewals or additional contracts, and in keeping his customers in touch with the defendant. Whether the renewals or additional contracts came in with or without his personal intervention was unimportant, so long as he was there to spur the customers, should they lag. These customers were his, and his interest to keep them for the joint benefit of himself and his employer

was the implied consideration for the defendant's agreement to pay him a commission upon all business that followed the original contracts. He was consequently entitled to commissions upon renewals or additional contracts which came in during his period of employment. We might even go further, an concede that he was entitled to contracts which he had previously secured. There is, however, absolutely nothing in the language of the contract to justify the extreme view of it which the plaintiff now takes. The customers were his while the employment lasted, but they were not his when they chose to contract directly with the defendant after his connection with the latter had ceased. The new contracts which these customers made with the defendant, after the plaintiff's discharge, were independent of those made during the period of his employment. In no just sense did they cover business which followed the original contracts. They covered business which came to the defendant upon a new status, and under the influence of fresh considerations. If the plaintiff is right, then these customers were perpetually his, and they could never, in any contemplated business relation to the defendant, get away from him. He would have more than a life enjoyment with respect to business emanating from them to the defendant; for the right to commissions, as now claimed, would upon his death undoubtedly go to his legal representatives. This was never contemplated. The construction which the plaintiff places upon this contract is strained and far-fetched, while that given to it by the referee is entirely reasonable, and must be sustained.

"The judgment was right, and should be affirmed with costs. All concur."

This case was cited with approval in *Jackson v. Stephens*, 83 Misc. 232, 145 N. Y. S. 827, 830, and *Worley v. Calculagraph Co.*, 87 Misc. 309, 149 N. Y. S. 943. The case of *Scott v. Engineering News Publishing Co.*, *supra*, is so similar to the case now before this court that it is unnecessary that we point out the similarity.

We therefore conclude that the appellee is entitled to an accounting from and against the appellants, Home News, Inc., Joseph Goldstein and Walter Goldstein, for commissions at the rates designated in Paragraph 1 of the chancellor's decree of July 9, 1943, on all business received by the defendants, or any of them, for advertising in the Home News from the customers set out in Paragraph 1 of said decree between the 15th day of August, 1941, and the 21st day of October, 1941.

We also conclude that the appellee is entitled to an accounting from and against the appellants for commissions at the rates specified in Paragraph 2 of said decree on all business received by the appellants, or any of them, for advertising in the Home News from the following customers which we find were secured by the appellee, if on contracts or options, whether verbal or written, in effect on October 21, 1941: Hutzler Brothers, Stewart & Co., Sears, Roebuck & Co., Hochschild, Kohn & Co., Acme Markets (American Stores), Bonwit Lennon, Food Fair, Inc., Ritz Enterprises, Christian Science, Howard C. Heiss, Joe the Motorist's Friend, Eastern Supply Co., Western Auto Stores, Shure's Drug Stores, The Hub, "Hecht's Reliable," Ada Christy, Albany Insurance Co., Fulton Fire Insurance Co., and Keystone Automobile Club Fire Insurance, until the expiration of those contracts or options.

To be deducted from the commissions aforesaid is the sum of $300 paid the appellee as salary for the six weeks he was in Westminster.

We conclude that the appellee is not entitled to commissions on renewal contracts or options or renewal business secured after his discharge on October 21, 1941.

In order to establish which of the above customers had contracts or options on October 21, 1941, and the date of the expiration of those contracts or options, it will be necessary to take additional testimony. As it will be necessary to have a new audit stated, we cannot pass further on the appeal from the audit.

As we find no prejudice to the appellants in the exceptions to the evidence, in view of this opinion, it is not necessary that we pass on those exceptions.

*Decrees affirmed in part and reversed in part and case remanded for further proceedings as set forth in this opinion. Costs to be paid by the appellants.*

GRASON, J., dissents.