BART ARCONTI & SONS, INC. ET AL.
*v.* AMES-ENNIS, INC.

[No. 188, September Term, 1974.]

*Decided June 26, 1975.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*James J. Doyle, Jr.,* with whom were *John B. Jaske* and *Sherbow, Shea & Doyle* on the brief, for appellants.

*J. Frederick Motz,* with whom were *Benjamin R. Civiletti* and *Venable, Baetjer & Howard* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

A contract dispute between a general contractor and subcontractor — exacerbated by a lengthy labor strike — has led to this appeal. Following a non-jury trial consuming 13 days in the Superior Court of Baltimore City (Sklar, J.) — during which almost 1900 pages of testimony were amassed, and countless exhibits were admitted — the trial judge resolved the contest in favor of the general contractor, Ames-Ennis, Inc. (Ames-Ennis). The subcontractor, Bart Arconti & Sons, Inc. (Arconti), its two principals, brothers Bart Arconti, Jr. (Bart) and George Arconti (George), and

two other corporations which they also controlled, G & L Construction Company and Atlas Tile & Terrazo, Inc., appeal from a judgment entered against each of them in the sum of $475,902.10.

After it had been awarded three contracts to construct public buildings in the City of Baltimore, the Northern Parkway Junior High School (Northern Parkway), the Women's Detention Center at the Baltimore City Jail (Women's Detention Center), and an extension to McCulloh Homes, a housing project for senior citizens, Ames-Ennis entered into subcontracts with Arconti in 1969 for the performance of the masonry and related work on each of those undertakings.

The execution of the three subcontracts was preceded by intensive negotiations between the parties. From the myriad changes and interlineations which characterize each of the documents in their final form, emerged the following provisions common to each of them, which are material to the outcome of this case. At the outset, the prime contract and its accompanying documents, with respect to which time is expressly made of the essence, are incorporated into the subcontracts. In relevant part, article 4 of the subcontract provides:

> "(a) The Subcontractor agrees to proceed with said work, and every part and detail thereof, in a prompt and diligent manner, and to facilitate the performance thereof, and will do the several parts of the work at such times and in such order as the General Contractor may direct, and shall and will proceed with and wholly finish the said work according to the said Drawings and Specifications, and this Contract, in such time as not to delay the other trades and to insure completion of the General Contract within the time fixed therein, the General Contract time being of the essence of this Contract and the date for completion of your phase of work being as shown on attached Schedule. . . .

* * *

"(c) Should there be a refusal on the part of this Subcontractor to comply with the aforegoing requirements in any respect which shall run more than two days after written notice, the General Contractor shall have the right to take possession of all materials and tools and make independent arrangements for the continuation and/or completion of same, charging such cost, as well as any expense or damages incurred as the result of default, against the unpaid balance. If such costs and expenses exceed the unpaid balance, this Subcontractor agrees to pay the deficit to the General Contractor. In this event, Subcontractor shall not be prevented from continuing or completing the work during or following the supplying of any such materials or installation by the Contractor.

"(d) Subcontractor shall reimburse and make good to General Contractor any damage sustained by General Contractor by reason of back charges, of other subcontractors and proportional share of liquidated damages and penalties payable to Owner, and the assent of the General Contractor to the delayed completion of the work shall not be construed as a waiver of Subcontractor's obligation to make good any such damage caused to the General Contractor by such delay."

Section (g) of article 7 provides in relevant part:

"Should there be a work stoppage caused by a strike, picketing, boycott or by any voluntary or involuntary cessation of work by employees of the Subcontractor, which in the judgment of the Contractor will cause; or is likely to cause unreasonable delay in the progress of construction then upon twenty-four (24) hours' written notice the Contractor shall have the right to prosecute the work as described in Article 4, Paragraph C. In such event the Contractor shall have the right to

take possession of and use all of the Subcontractor's materials (exclusive of tools) intended for use on the work. The cost of completion shall be charged against the Subcontractor's remaining interest in the contract price. If the Subcontractor's remaining interest in the contract price exceeds the cost of completion, the Subcontractor shall be entitled to the difference. If, however, the cost of completion exceeds the Subcontractors' remaining interest in the contract price, then the Subcontractor agrees to pay the Contractor such excess within thirty (30) days after written demand for such excess has been made upon him by the Contractor."

In addition, article 3(m) of the Northern Parkway subcontract requires that "[a]ll work shall be performed with sufficient manpower, material and equipment such as to adhere strictly and rigidly to the Construction Schedule, time being the essence of this contract."

Subject to a specified sum being retained until completion, each of the contracts provided for the subcontract price to be paid for "the value of the work performed during any calendar months" in monthly installments "within five days after payment therefore is received by the Contractor from the Owner."

During a period ranging from August through October 1969, Arconti commenced to work on the three projects, beginning with Northern Parkway. According to the evidence, problems ensued almost immediately at the school and the Women's Detention Center. This entire period, through March 1970, was punctuated by repeated requests from Ames-Ennis to Arconti — written and verbal — to supply adequate labor and materials for those projects. For the most part, these complaints went unheeded — to the extent that frequently they were not even relayed by Bart or George to their own supervisory personnel on the jobs. Illustrative of this manpower deficiency is the evidence that Arconti never had more than eight workers at Northern

Parkway — and usually less — whereas it should have had three or four times that many.

Similar problems arose in respect to Arconti's failure to make timely submissions of material samples for approval by the city's architects. Although Arconti went through the motions of challenging the Ames-Ennis evidence in this regard, even Bart conceded at the trial that his company may have been somewhat "dilatory." Because of these delays, performance by Arconti had proceeded so slowly, according to evidence presented by Ames-Ennis, that by late March only two to four percent of the work at Northern Parkway had been completed instead of the expected 65 to 75 percent.

Throughout this period, the monthly payments on the contracts were made in accordance with the requisitions presented by Ames-Ennis. Although the contracts specified that Arconti was to be paid within five days of payment from the owner to Ames-Ennis, this schedule was not strictly maintained in actual practice. Frequently, the payments were received late by Arconti.

Early in 1970, the threat of a strike affecting various construction trades arose because a number of labor contracts were scheduled to expire on March 31. This was of particular concern to Ames-Ennis because time was of the essence in its contracts with the city, and strikes were not recognized as excusable causes of delay in performance. Furthermore, the Northern Parkway and Women's Detention Center contracts subjected Ames-Ennis to the payment of liquidated damages in the event of such unexcused delays in completion. The lack of progress on the part of Arconti only magnified the problem.

With the strike impending against this background, Ames-Ennis advanced two alternative proposals to Arconti. First, it urged that Arconti enter into a "retroactive" agreement with the labor unions whereby Arconti would pay its employees retroactively for work they performed during the strike at the wage rate ultimately approved at the conclusion. Alternatively, Ames-Ennis proposed to employ

the required labor force itself to do the masonry work, and that Arconti attend to the supervision of construction and the ordering of materials. Both proposals were rejected by Arconti because it was a member of the management team negotiating with the union; hence, to sign a retroactive agreement or otherwise cooperate during the strike would compromise management's negotiating position. Ames-Ennis responded to this rejection by declaring that if Arconti "walked off" the jobs, it would exercise its rights under the contracts by effecting independent arrangements to complete the performance of Arconti's work during the strike, and would charge the costs thereof against the unpaid balance, if any, due Arconti.

Previously, on February 25, Arconti had presented its regular monthly requisitions for payment in accordance with the Northern Parkway and Women's Detention Center contracts. Under the normal practice which by then had become established, Ames-Ennis could have expected to receive payment of the requisition it had submitted to the city for the work performed by Arconti approximately a month later. It did receive this payment on March 26 and 31, respectively, and under the literal terms of the contracts, therefore, would have been obliged to pay Arconti on March 31 and April 5. On March 31, the strike was called and Arconti "walked off" the jobs.

The departure of the Arconti personnel and the Ames-Ennis refusal to pay the February 25 requisition not unpredictably triggered the dispute which has culminated in this appeal. Ames-Ennis refused to pay the February invoices in light of Arconti's rejection of the proposals which it had offered as a solution to the expected work stoppage. Also, Ames-Ennis claimed that it was required to withhold payment in anticipation of the likely need to charge Arconti's account for costs incurred to obtain performance during the strike. Arconti never offered to work or otherwise cooperate through the strike even if it were to be paid.

After the strike commenced, the parties engaged in a race to declare the other in default. On April 8, Arconti directed letters to Ames-Ennis pertaining to the three projects. Its

offer to continue performing at McCulloh Homes with non-union labor was rejected by Ames-Ennis. On the same day, Arconti served notice that the two other contracts were "terminated" because of the "default in making payment as required thereunder." Prior to the receipt of those letters, Ames-Ennis fired off telegrams to Arconti stating that in accordance with the contracts, it would "make all arrangements required to obtain the necessary labor, material and equipment to continue the work" and that "all costs incurred will be recorded and charged to your account."

A week later, Ames-Ennis engaged another masonry subcontractor, Manna Brothers, to continue the Arconti work during the strike at Northern Parkway and the Women's Detention Center. No subcontractor was employed at McCulloh Homes during the strike, and when it ended on May 18, Arconti immediately resumed working there, but not at the other two projects.

On May 25, the contestants and their attorneys met with a view toward the resumption of work by Arconti — at least at Northern Parkway. At that meeting, it was agreed that Ames-Ennis would immediately pay to Arconti $20,000 on account of the $38,000 which it owed for work at McCulloh Homes. Arconti agreed to inspect the other two jobs to evaluate the amount of work yet required to be completed, and to assess the value of the work theretofore performed by Manna Brothers. On June 3, they met again to settle this item. Although Ames-Ennis had paid Manna $65,000, Arconti thought that the work was worth only $34,000. They compromised on $40,000 as the sum which should be charged against Arconti for the work performed by Manna prior to May 25. A further charge for work performed from that date until Arconti would return was to be imposed on the basis of 80% of the amount paid to Manna Brothers. It was further agreed that Manna Brothers would be discharged at the end of the work day on Friday June 5, 1970, and that Arconti would return to Northern Parkway on June 8. The agreed notice was then given to Manna Brothers.

Late in the afternoon of June 5, a dispute arose between the parties which jettisoned for all time an amicable resolution of their differences. Precisely what transpired on that occasion is the subject of some dispute. After Manna Brothers had been dismissed from the Northern Parkway job in pursuance of the June 3 agreement, it was reported to Ames-Ennis late on the 5th that Arconti personnel were removing its equipment from the McCulloh Homes site. A telephone call to Arconti proved to be futile. According to the latter, Ames-Ennis demanded that Arconti have more workers report to Northern Parkway on the 8th than was reasonably required. Ames-Ennis disputes this testimony. In any event, Arconti did not return to Northern Parkway on the 8th and withdrew from McCulloh Homes on the same day.

Later that year, Ames-Ennis filed this suit, alleging not only that Arconti had breached each of the three original contracts, with the consequent damages created by the need to engage other subcontractors to complete the work, but also claiming a breach of the June 3 modification, and seeking damages against Bart, George and the two other corporations. By way of a counterclaim, Arconti sued Ames-Ennis for damages caused by the latter's failure to pay the March requisitions on all three projects plus the February invoices for Northern Parkway and the Women's Detention Center. As a result of these alleged breaches, Arconti claimed it lost profits on the three contracts.

After holding the matter sub curia at the conclusion of the protracted trial, the court rendered a detailed memorandum opinion in which it determined that because of Arconti's persistent delays in performance, recounted earlier, Ames-Ennis "had a right to withhold payments on requisitions in March, 1970, when it received word that [Arconti] would not prosecute its work during the period of the upcoming strike" since under the contracts, it could charge the costs of completion to the subcontractors' account. The court also found as a fact that Arconti had "waived its right to complain about delays in its receipt of

payment from [Ames-Ennis] by its course of dealings in which it accepted late payments without protest." Indeed, Arconti had frequently been late in submitting its own requisitions. For these reasons, the court denied recovery under the counterclaim.

In sum, the court found that Arconti was free to return to the jobs when the strike ended, and that its failure to do so could not be justified by the refusal of Ames-Ennis to pay the earlier requisitions, since the latter action was warranted. Additionally, the court found as a fact that the parties modified the Northern Parkway contract "by agreeing to the amount of credit for the work done by Manna [Brothers] to the project in the absence of [Arconti], and to the resumption of the job by [the latter] on June 8." Thus, both agreements — the original and the modification — had been breached.

The court also entered judgment against Bart, George, G & L Construction Company (G & L) and Atlas Tile & Terrazo, Inc. (Atlas). Whereas Arconti had been engaged in ceramic tile and masonry construction · work, G & L specialized in the latter and Atlas in the former. All three corporations operated at the same place of business — owned by Arconti — shared the same equipment and employed the same workmen. Bart and George had owned all of the stock in the three corporations during their entire existence.

By everyone's admission, Arconti became "dormant" in late 1971. At a meeting on November 26 of that year, the Board of Directors — dominated by Bart and George — resolved that "the Company would now cease to operate and [would] lie dormant until the litigation with Ames-Ennis, Inc. can be completed." Previously, Arconti had been the more prominent of the three corporations. In its last fiscal year of normally active operations, it had five large construction jobs in progress, including the three in issue here. Conversely, as the trial court found, when Arconti became dormant, the G & L and Atlas fortunes improved markedly. The trial judge also found that while all this was

happening, Arconti assets and equipment were being used, without compensation, by the other two corporations. In addition, he found that loans had been made by Arconti to Bart and George, although the latter claimed that a portion of this indebtedness was subsequently reduced by crediting against it unpaid salaries which were due them. He also found that in 1972, Arconti had transferred to Bart and George its rights to two insurance policies maintained on their lives which, according to the corporation books, then had a net cash surrender value of over $38,000.

The court found that the purpose of these activities had been to "evade legal obligations devolving upon [Arconti] during the pendency of the present action." This resulted in rendering Arconti "all but insolvent." Thus, it found that Bart and George, as the dominant directors and sole shareholders of all three corporations, had "personally directed their operations with only one purpose in mind, using the corporate entities of [G & L] and [Atlas] to keep the subcontracting business of [Arconti] but without leaving any real asset of [Arconti] remaining in that corporation." The court found that these actions justified piercing the corporate veil, and the entry of judgments against Bart and George as well as against the two other corporations.

Upon these findings and conclusions of law, the trial court awarded the total judgment of $475,902.10 against appellants by granting recovery under the original contracts and giving effect to the modification made on June 3 respecting Northern Parkway, which it also found to have been breached. The measure of damages applied by the court, subject to appropriate allowances and adjustments, consisted of allowing so much of the total costs paid to complete the three projects as exceeded the original subcontract prices. Neither the measure of damages nor the amount thereof are challenged in this appeal.

In this Court, appellants present these contentions:

1) That Ames-Ennis did not have the right to withhold the February requisition payments, and therefore breached the contract.

2) That the court below erred in piercing the Arconti corporate veil and assessing liability against the remaining appellants.

(1)

The trial court concluded, in effect, that at the time Arconti "walked off" the jobs on March 31, it had breached the contracts, and under the authority of *K & G Construction Co. v. Harris*, 223 Md. 305, 164 A. 2d 451 (1960), ruled that the promises by Arconti to perform and by Ames-Ennis to make monthly payments were mutually dependent. Thus, the latter was justified in refusing to pay the February requisitions. Unquestionably, whether this refusal was warranted is pivotal to the outcome of this case. For, if Ames-Ennis was not entitled to withhold payment, then the failure to release the installments was itself a material breach and excused further performance by Arconti. *See Shapiro Eng. Corp. v. Day Co.*, 215 Md. 373, 379, 137 A. 2d 695 (1958), and the cases therein cited.

This ruling — that Arconti had breached the contracts when it "walked off" the jobs — is vigorously attacked by appellants. In essence, they claim that under the contracts, the refusal to work during the strike could not be a breach, but merely permitted the general contractor to charge Arconti's account for the cost of continuing its performance through another masonry subcontractor. As they correctly observe, had there not been engrafted upon article 7 any changes and interlineations, the mere failure to work during the strike would likely have constituted a breach. The contract provisions that would have produced this result, however, were deleted in the negotiating process which preceded execution.

Nevertheless, the argument advanced by appellants overlooks the entire basis for the stance adopted by Ames-Ennis in March 1970 — as succinctly reflected by its battery of telegrams and letters spanning a period of many weeks. First, under no circumstances could payments on the February requisitions for Northern Parkway and the Women's Detention Center have become due prior to March

31. It will be recalled that under the contract, payment of any monthly installments to Arconti did not become due until five days after Ames-Ennis received payment from the city. The February requisition for Northern Parkway was paid by the city on March 26 and for the Women's Detention Center on March 31. Thus, Arconti did not become entitled to payment prior to March 31 and April 5, respectively. The trial court thus found from the evidence that the delay in making these payments prior to April 8 — the date on which Arconti purported to terminate the two contracts — had been waived by Arconti's course of conduct in accepting late payments on at least 50 percent of the requisitions which had been previously submitted. *See Shriver Co. v. Interocean Co.*, 157 Md. 341, 352-53, 146 A. 223 (1929).

Secondly, as recently as March 20, Ames-Ennis had complained of the "manpower conditions existing since the first of the year" at the Women's Detention Center. In a similar vein, on April 8, after work by Arconti had halted, separate telegrams invoking Articles 4 and 7 in reference to Northern Parkway and the Women's Detention Center emphasized the "lack of adequate performance" as the reason for "withholding payment."

The proposition that the chronic labor and material shortages alone supported the refusal to pay the February requisitions is challenged by appellants on the ground that any such breach which may have occurred because of the persistent manpower shortages was waived through the continued acceptance of performance and payment therefor by Ames-Ennis. The short answer to this contention is that the trial court did not find that such a waiver had occurred, presumably because, as the evidence shows, the critical impact of the delays did not become fully apparent until late March when the stike was about to be called. In any event, no such finding of waiver was compelled under the evidence in this case. Furthermore, as we have suggested, it was not the delays alone on which the trial court bottomed its finding that Arconti had breached the contracts.

For these reasons, therefore, the trial court found that the failure to pay the February requisitions by April 8 was not

unjustified under the circumstances — and therefore did not constitute a breach on the part of Ames-Ennis. On the contrary, Arconti's deliberate delays in performance — which became more acute as the projected strike date approached — and its arbitrary refusal to assist with any alternative to a complete work stoppage were found to have established a breach on its part. As the court noted in arriving at this result, despite repeated entreaties by Ames-Ennis, Arconti had not even sought to return to Northern Parkway and the Women's Detention Center after the strike ended on May 18. Yet, it promptly returned to McCulloh Homes without fanfare on the following day.

One of the many inferences, unfavorable to Arconti, which the court was free to draw from the evidence in this case was that since no work had been performed on McCulloh Homes during the strike — unlike the two other projects — a return to work by Arconti at that site would likely have been profitable whereas that would not have been true at the other locations. The trial court also could reasonably have inferred from the fact that Arconti had deliberately performed only two to four percent of its work at Northern Parkway as of March 31 instead of 65 to 75 percent, and its ultimate failure to return following the strike, that its alleged inability to join in a solution was merely a pretext for abandoning the job. In a case where due regard must "be given to the opportunity of the lower court to judge the credibility of the witnesses," these inferences are of no little significance. In any event, we cannot hold "clearly erroneous" the decision by the trial court that the "walk out" was merely the final "straw" in a series of events which established a breach by Arconti. Maryland Rule 886.

The determination that Arconti had breached the original contract would appear to cast some doubt on the need to consider the modification issue. In any event, whether the subsequent agreement was made on June 3 and was thereafter breached were also solely questions of fact, the resolution of which cannot be disturbed in light of Rule 886.

### (2)

The decision below to disregard the Arconti corporate veil, and to enter the judgment against the remaining appellants presents a more difficult question. The court determined from the evidence that entry of the judgment against the individuals was justified because they had directed the operations of all three corporations with the exclusive intention of "using the corporate entities of [G & L] and [Atlas] to keep the subcontracting business of [Arconti] but without leaving any real asset of [Arconti] remaining in that corporation." It rested this conclusion essentially on the evidence that construction equipment owned by the three corporations had been commingled; that the three corporations had operated out of one place of business belonging to Arconti; that Arconti had been permitted to become dormant while the affairs of the other two corporations improved simultaneously; and on the loans made to Bart and George, and the transfer of the insurance policies to them.

As authority for its action, the court relied exclusively on Brune, *Maryland Corporation Law and Practice*, § 371 (rev. ed. 1953):

> "*First.* Where the corporation is used as a mere shield for the perpetration of a fraud, the courts will disregard the fiction of separate corporate entity.
>
> "*Second.* The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, in order to prevent evasion of legal obligations.
>
> "*Third.* Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, fail to observe the corporate entity, operating the business or dealing with the corporation's property as if it were their own, the courts will also disregard the corporate entity for the protection of third persons."

The court found that the second and third rules were applicable here, and stated that to hold otherwise "would be to permit the defendants to use the corporate shield as a sword, and would create a manifestly unjust result. This the Court declines to permit."

This decision is strenuously attacked by appellants. They insist that the evidence compels but one conclusion — that Arconti "simply ran out of working capital"; that when it lapsed into dormancy, the insurance policies were encumbered with loans, and "were in reality liabilities because the premiums and interest had to be paid while the policies contained no cash value." For this reason, they "were transferred to Bart and George as they had some insurance value to the individuals." In the final analysis, they say, there is no legal foundation to support the action taken below. Their legal arguments are posed in this manner: That G & L and Atlas were not successor corporations to Arconti; that contrary to the argument advanced by Ames-Ennis, Bart and George are not individually responsible under a theory of tortious interference with the subcontracts; and that Bart and George did not intentionally waste the assets of Arconti.

Each of these contentions is challenged by appellee who also relies here upon the previously quoted statements from Brune, *supra*, in arguing that Bart and George dealt with Arconti property "as if it were their own" and for the purpose of evading the legal obligation of that company to Ames-Ennis.

Although a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, *Md. Trust Co. v. Tulip Realty*, 220 Md. 399, 414, 153 A. 2d 275 (1959), shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity. *Damazo v. Wahby*, 259 Md. 627, 633, 270 A. 2d 814

(1970); *see Gordon v. SS Vedalin,* 346 F. Supp. 1178, 1181 (D.C. Md. 1972).

Here, the trial judge, in relying upon the statement in Brune, *supra,* made no reference to fraud, the first ground mentioned there, presumably because he was of the view that no evidence to support such a finding had been produced. Nor does appellee rely upon that ground in this Court.

As is frequently true of legal propositions broadly stated in the abstract, the second and third grounds mentioned in Brune, *supra,* have an appealing quality about them, but we find no authoritative support permitting their applicability to the facts of this case. Foremost among the cases cited in the appended footnotes is *Compensation Board v. Albrecht,* 183 Md. 87, 92, 36 A. 2d 666 (1944), where the Court did state by way of *dicta:* "The court may consider a corporation as unencumbered by the fiction of corporate entity, and deal with substance rather than form, as though the corporation did not exist, in order to prevent evasion of legal obligations and to subserve the ends of justice." But governing the outcome in that case was the "common control clause" which was included in the Unemployment Compensation Law. Thus, that case is clearly inapposite.

Similarly, each of the remaining cases cited as support for the Brune propositions is factually distinguishable from the present one. The case of *Home News, Inc. v. Goodman,* 182 Md. 585, 593-94, 35 A. 2d 442 (1944), might superficially appear to be authority for piercing the corporate veil in circumstances where stockholders "fail to observe the corporate entity, [*i.e.,*] operating the business or dealing with the corporation's property as if it were their own," Brune, *Maryland Corporation Law and Practice, supra.* Upon close scrutiny, however, it becomes apparent that the action there was founded upon a contract which the corporate principals had originally entered into as individuals. Hence, they were held jointly liable with the corporation which thereafter came into existence.

Nor are we aware of any Maryland case where, on facts

resembling those here, the Court has allowed the corporate entity to be disregarded merely because it wished to prevent an "evasion of legal obligations" — absent evidence of fraud or similar conduct. As we intimated earlier, both grounds advanced in Brune, *supra,* have a persuasive ring, but extend far beyond any prior holding of this Court — at least when sought to be applied to such circumstances as obtain in the present case. The common thread running through the Maryland cases — as stated earlier — is that the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity.

As an alternative ground for sustaining the decision below, appellee maintains that Bart and George should be held liable since they caused Arconti to breach its contracts with Ames-Ennis; thus, the latter relies upon a rule which seems to enjoy support in a number of other jurisdictions — that a corporate officer who tortiously causes his corporation to breach a contract is liable where his action is motivated by a desire for personal gain. This argument is misplaced here. First, the individual appellants were not sued in tort, but have been held liable for the contracts of the corporation. Moreover, such tort liability does not fasten where the officer is in good faith serving the corporation interests, *Zelinger v. Uvalde Rock Asphalt Company,* 316 F. 2d 47 (10th Cir. 1963); unless he exceeds his powers or authority as an officer or is guilty of fraud, *Southwestern States O. & G. Co. v. Sovereign Resources,* 365 S.W.2d 417 (Tex. 1963); or his acts involve separate tortious conduct, *Fermetal Steel Corp. v. Heckett,* 6 App.Div.2d 781, 174 N.Y.S.2d 719 (1958); *see Md. Trust Co. v. Tulip Realty, supra,* 220 Md. at 414; *cf. Ace Development Co. v. Harrison,* 196 Md. 357, 366-67, 76 A. 2d 566 (1950). No showing of such grounds has been made here as would permit this theory of recovery to be invoked.

In a final effort to retain the judgments entered against the individual appellants, Ames-Ennis argues that they should be held liable for having intentionally wasted the assets of the corporation. Assuming without deciding that,

as a creditor of the corporation, it could maintain such a claim, *Pritchard v. Myers*, 174 Md. 66, 77-78, 197 A. 620, 116 A.L.R. 775 (1938), appellee nevertheless cannot prevail on this argument. While we have held that the directors of a corporation may be held individually liable for permitting corporate assets to be wasted, this rule applies only where this occurs in consequence of "gross or culpable negligence." *Devereux v. Berger*, 264 Md. 20, 32-33, 284 A. 2d 605 (1971); *Parish v. Milk Producers Assn.*, 250 Md. 24, 74, 242 A. 2d 512 (1968). Again, no finding to this effect was made here, even assuming this theory was properly pleaded below.

The recovery against G & L and Atlas rests upon an even more tenuous reed. Appellee seems to recognize that to prevail in this regard, it must do so upon the premise that those two corporations are successors in interest to Arconti. It urges upon us the principle, relying heavily on *Stanford Hotel Co. v. M. Schwind Co.*, 180 Cal. 348, 181 P. 780 (1919), that "where a corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation, and will hold it liable for the debts of the former corporation." 181 P. at 783. The short answer here is that neither of the two corporations are shown by the evidence to be successors to Arconti.

Nor can recovery against G & L and Atlas be posited upon an agreement or intention to assume the debts of Arconti. *See Auto. Retailers v. Evans Cig. Serv.*, 269 Md. 101, 106-07, 304 A. 2d 581 (1973). No such circumstances were found to exist here. Therefore, neither G & L nor Atlas can be held liable on the contracts between Arconti and Ames-Ennis.

Although the corporate entity must be honored, our holding is without prejudice to Ames-Ennis' pursuing in some future action *any* assets which it claims were transferred from Arconti to any of the other appellants by fraudulent conveyance. *See Damazo v. Wahby, supra,* 259 Md. at 635; Maryland Code (1957, 1971 Repl. Vol.) Art. 39B, §§ 1-14. In any event, the judgment predicated on liability

from Arconti to Ames-Ennis cannot be entered here against the two individuals and the two other corporations.

*Judgment against Bart Arconti & Sons, Inc. affirmed; judgment against remaining appellants reversed; each party to pay its own costs.*